[L.A. No. 30430. In Bank. July 10, 1975.]

NOEL CANNON, a Judge of the Municipal Court, Petitioner, v.
COMMISSION ON JUDICIAL QUALIFICATIONS, Respondent.

## COUNSEL

Ruman & Spizer, I. Richard Ruman, Ball, Hunt, Hart, Brown & Baerwitz, Joseph A. Ball, Kaplan, Livingston, Goodwin, Berkowitz & Selvin, Herman F. Selvin and Sheldon W. Presser for Petitioner.

Dryden, Harrington & Swartz and George J. Franscell as Amici Curiae on behalf of Petitioner.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Kent L. Richland, Lynette A. Moore and James H. Kline, Deputy Attorneys General, for Respondent.

## OPINION

**THE COURT.—** ▆ The Commission on Judicial Qualifications (the Commission) has unanimously recommended the removal from office of Judge Noel Cannon of the Municipal Court for the Los Angeles Judicial District of the County of Los Angeles. Judge Cannon has petitioned this court to modify or to reject the recommendation. We have independently reviewed the entire record and have adopted with slight modification the findings of the Commission.[1]

We conclude that petitioner has engaged in twenty-one acts constituting "wilful misconduct in office" and in eight other acts constituting "conduct prejudicial to the administration of justice that brings the judicial office into disrepute."[2] Although some of the specific acts charged and found may overlap as arising out of a particular course of conduct, the totality of petitioner's judicial misconduct nevertheless presents a compelling case against her. We deem to be particularly egregious the bad faith and maliciousness with which petitioner arbitrarily ordered the immediate incarcerations of deputy public defenders who displeased her, and denied the effective right of counsel to their clients who were required to defend against charges in on-going criminal proceedings with substituted counsel who were afforded no reasonable opportunity to prepare. As we find nothing to excuse or mitigate Judge Cannon's conduct we adopt the Commission's recommendation and order that she be removed from office.

Petitioner was appointed a judge for the Los Angeles Judicial District on April 10, 1963. The proceedings herein were initiated by the filing of a

---

[1]The make-up of the Commission is provided for in the California Constitution. (Cal. Const., art. VI, § 8; see *Spruance* v. *Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 782, fn. 1 [119 Cal.Rptr. 841, 532 P.2d 1209].)

In those instances wherein we have adopted Commission findings and conclusions we have substituted the word "petitioner" for "respondent." Judge Cannon was correctly designated respondent in proceedings before the Commission, but in proceedings before this court she is cast in the role of a petitioner seeking relief from the Commission's recommendation.

[2]This court is authorized to censure or remove a judge on recommendation of the Commission. The recommendation must be based on "action occurring not more than 6 years prior to the commencement of the judge's current term that constitutes wilful misconduct in office, wilful and persistent failure to perform the judge's duties, habitual intemperance, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute." (Cal. Const., art. VI, § 18, subd. (c).)

Rules for implementing the constitutional provisions are provided by the Judicial Council (Cal. Const., art. VI, § 18, subd. (e)) within the framework of the California Rules of Court. Judge Cannon has petitioned for modification or rejection of the Commission's recommendation pursuant to rule 920.

All references to specific rules herein are to California Rules of Court.

notice of formal proceedings on July 8, 1974 (rule 905), and thereafter petitioner filed her verified answer denying the allegations set out in the formal notice. We appointed three special masters who commenced evidentiary hearings on October 15, 1974. (Rule 907.)[3] The masters concluded hearings on November 6, 1974, and filed their report on November 19 unanimously recommending censure of petitioner. Both petitioner and the examiners designated by the Commission to prosecute the charges (rule 921(f)) filed written objections to the report (rule 913), and the objections were orally argued before the Commission on February 7, 1975 (rule 914). The Commission thereupon made its recommendation on March 3, based on findings of fact and conclusions of law as hereinafter appear (rules 918, 919). Petitioner, by virtue of the Commission's recommendation, is disqualified from acting as a judge for as long as that recommendation remains pending before this court. (Cal. Const., art. VI, § 18, subd. (a).)

The lengthy charges of petitioner's misconduct are summarized in the margin. We have omitted from that summary, however, those particular alleged specific acts of misconduct not sustained by the findings of the Commission and dismissed by it.[4]

---

[3]The special masters so appointed were: Charles H. Older, Judge of the Superior Court of Los Angeles County, Samuel L. Laidig, Judge of the Municipal Court for the Pasadena Judicial District of Los Angeles County, and Celia W. Baker, retired Judge of the Municipal Court for the West Orange County Judicial District.

[4]Petitioner was charged in count one with "wilful misconduct in office" (hereinafter wilful misconduct) and in count two with "conduct prejudicial to the administration of justice that brings the judicial office into disrepute" (hereinafter prejudicial conduct). The specifications of misconduct are the same as to each count, and are set forth hereinafter without reference to a particular count. The charged misconduct (pars. A through H) and the specific acts alleged in support of each charge are as follows:

"A. You have abused your contempt power, and thereby infringed upon the constitutional right of criminal defendants to effective assistance of counsel. . . ." Four instances are charged wherein petitioner held deputy public defenders appearing before her in preliminary hearings to be in direct contempt. For purposes of identification these contempt citations will hereinafter be referred to by the names of the deputies cited: Ridgeway (A-1), Ryan (A-2), Karagozian (A-3), and Putnam-Pine (A-4). The facts constituting the specific instances of alleged misconduct will hereinafter be set out in greater detail.

"B. You have unlawfully interfered with the attorney-client relationship by relieving counsel of record and appointing new counsel. . . ." There are charged the four instances (see par. A) wherein public defenders were cited for contempt and removed to the county jail, and different counsel were summarily appointed to represent the criminal defendants in ongoing preliminary hearings. Additionally, a fifth specification involves a public defender (Mrs. Henley) who displeased petitioner and was substituted out as counsel although not cited for contempt. (All five of the foregoing matters are designated in the formal notice under item B-1.) A sixth specification involves private counsel (Kroneberger) who was relieved at his request. Petitioner appointed and dismissed a public defender (Weiss) who questioned the defendant's financial eligibility to be

The masters found that all the specifications of the formal notice, as appearing in footnote 4, *ante,* to be proved to the extent that they

publically defended. Petitioner then appointed a second public defender (Fleishman) who, it is alleged, was intimidated into proceeding with the preliminary examination. (B-2.) A seventh specification involves a private counsel (Ingber) who was relieved upon attempting to file an affidavit of prejudice against petitioner. A deputy public defender was summarily appointed to proceed with the preliminary hearing. (B-3.)

"C. You have acted unreasonably and arbitrarily in matters of bail-setting and the issuance of bench warrants. . . ." It is charged that petitioner had been informed by a veterans hospital that an accused (Russo), who had been released on $500 bail, was unable to appear at a preliminary hearing because he was being evaluated in the hospital for meningitis. Petitioner issued an arrest warrant, set bail at $50,000, and had petitioner arrested at the hospital and removed over the doctor's objections. (C-1.) It is next charged that an accused (Brooks) against whom pending charges for want of prosecution were dismissed, was wrongfully ordered back into custody by petitioner when he would not stipulate to probable cause for his arrest. (C-3.) It is also charged that a juvenile (Alcorn) was certified to juvenile court by petitioner as to certain counts of a multiple count complaint. When the juvenile objected to continuing the preliminary hearing as to the remaining counts, petitioner vacated the certification and revoked bail. When the juvenile and his mother both uttered exclamations petitioner held both to be in contempt and set bail at $100,000 each. After both were in custody for an hour petitioner ordered the contempt charges quashed and reinstated the bail and certification. There was then no objection to the continuance. (C-4.) Petitioner is also charged with having arbitrarily increased bail from $3,000 in the case of an accused (Farrell) who, after being denied release on his own recognizance, indicated his displeasure and stated that he did not care what bail was set. Petitioner raised bail in steps to $5,000, to $10,000, and to $20,000. Petitioner then stated, "And if you want $50,000, we'll make it $50,000," which she did. (C-7.)

"D. You have engaged in conduct calculated to instill in defense attorneys a state of submissiveness and fear so as to expedite preliminary hearings, thereby infringing on a defendant's constitutional right to effective assistance of counsel. . . ." The Henley matter is again referred to (see par. B). The deputy public defender in that matter vainly attempted to ascertain the nature of inquiries petitioner objected to as proper cross-examination. In relieving her as counsel petitioner stated: "We have had the record read. If you can't tell from that, you are not qualified to represent the defendant." (D-1.) It is also charged that petitioner cautioned a deputy public defender (Dennison) in chambers not to ask certain "stupid" questions at a preliminary hearing, cautioning that "If you are thinking of any outlandish questions, check with the people in lock-up to see how they would recommend the food in county jail for the weekend." (D-2.)·

"E. You have abused the prerogatives of your high office. . . ." It is charged in this paragraph that petitioner was "profane, vulgar, vicious and abusive" in confronting a police officer first at a street intersection and later when the officer (Fagin) was summoned to petitioner's chambers. (E-1.) The facts constituting this incident will be set out in greater detail in the text of the opinion. It is also charged that on another occasion petitioner verbally abused a police officer both in open court and in her chambers when the officer (Laird) inquired of a deputy district attorney why petitioner had interrupted a preliminary hearing to read a police report and dismiss charges. (E-4.) On still another occasion when deputy public defenders had been delayed in interviewing their clients at arraignment proceedings petitioner required the deputies (Ash-Hopkins) to state under oath their reasons for the delay, and ordered them to remain in the lock-up for more than four and a half hours while they conducted interviews. (E-5.)

"F. You have engaged in curt and rude conduct by deliberately ridiculing qualified members of the bar without cause. . . ." It is charged that petitioner became "very angry" when an accused refused after dismissal on preliminary hearing to stipulate to probable

constituted acts of either wilful misconduct or prejudicial conduct, with the exception of five matters: The Russo matter of paragraph C (C-1),

cause for his arrest. Petitioner challenged the accused's public defender (Klein), had him swear under oath that he had read the arrest report aloud to his client, inquired into his legal training and experience, and when it appeared that the deputy had been in practice but six weeks, stated: "Six weeks and you are telling me you know everything there is to know about the law?" (F-1.) On a second occasion petitioner engaged a private counsel (Shalant) in conversation in the court room after announcing noon recess. Petitioner stated to Shalant in the presence of his clients that she was ashamed of his poor representation and wished to report him to the State Bar. Before court reconvened, again in the presence of Shalant's clients, petitioner apologized to Shalant. In the afternoon session, petitioner required Shalant to submit a written offer of proof as to what he intended to establish in particular examinations of witnesses. After an hour and a half petitioner resumed the bench without indication that she had read the still incomplete written offer of proof. She next refused to accept a stipulation regarding facts to which a chemist would testify if called as a witness, but refused to advise why the stipulation was unsatisfactory, stating, "You will not cross-examine the court." She then required that the chemist appear as a witness, recessing until 8 p.m., but refused to honor Shalant's request to obtain food at a vending machine on another floor in the building. Finally, petitioner cut short with threats of contempt citations Shalant's attempts to argue in support of his motion to dismiss charges. (F-2.) The incidents hereinbefore referred to as the Putnam-Pine matter of paragraph A, the Kroneberger-Weiss-Fleishman matter of paragraph B, and the Henley matter of paragraphs B and D are also cited in support of the charge of this paragraph F (F-3, F-4 and F-5, respectively).

"G. You unlawfully ordered the court reporter to delete material from preliminary hearing transcripts. . . ." This charge is made in connection with the Putnam-Pine matter of paragraph A. The language sought to be deleted consisted of the following remarks by petitioner: "Now, Paul James [Public Defender] did that to me, and he had better not do that again, and none of you had better do that to me again, lying to me in open court. . . . I have had this practiced on me by Public Defender after Public Defender, and in particular participated in by Paul James of your office who lies to me in open court." (G-1.)

"H. You have engaged in bizarre conduct. . . ." A number of incidents are referred to in support of this charge. In 1967 the judges of petitioner's court passed a resolution criticizing petitioner for certain alleged exhibitionist conduct, including the display of a newly decorated pink chamber to the news media, and advocacy to the media that women should arm themselves against attack with derringers and hat pins. In response petitioner charged in the news media that her colleagues on the bench were guilty of judicial immorality, intemperance, inability, absenteeism and unpunctuality. Petitioner's conduct was the subject of a letter directed to her from the Commission in 1967. (H-1.) It is also charged that for a number of months in 1972 petitioner maintained a mechanical canary in her chambers. The chirping of the device was audible during proceedings in the courtroom through the partially open chamber door. (H-2.) Petitioner also, during the summer and fall of 1972 and early part of 1973, brought a small dog to the courtroom. She either held the dog or maintained it under the bench while the court was in session. (H-3.) Also between September 1972 and March 1973 petitioner arranged for a minister (Reverend William Blackstone) to use an interview room for the purpose of speaking with all persons in custody. Petitioner arranged that the minister be paid $700 to $800 a month from private sources to which she contributed. (H-4.) It is also charged that petitioner wrongfully refused to honor an expense voucher for a witness who came from Washington, D.C. to testify at a preliminary hearing. Petitioner stated to the district attorney's investigator who presented a voucher for petitioner's approval that the witness (Miss Belfrey) was an accomplice who was sexually interested in the defendant, that the investigator should not have an affair with the witness, and that he should not repeat any

the Hopkins-Ash matter of paragraph E (E-5), the alleged unlawful order to delete material from a transcript of paragraph G (G-1), the mechanical canary matter of paragraph H (H-2), and the matter involving Reverend Blackstone of paragraph H (H-4). The masters concluded that in each instance wherein they made affirmative findings petitioner had acted in bad faith and was guilty of wilful misconduct with the exception of the Brooks matter of paragraph C (C-3), the Laird matter of paragraph E (E-4), the Shalant matter of paragraph F (F-2), and all matters of paragraph H (H-1, 3, 5 and 6). The masters concluded as to those excepted matters that petitioner was guilty of prejudicial conduct, although they were of the view that her conduct in connection with the resolution of censure by her fellow judges (H-1) was too remote in time to constitute grounds for disciplinary action. The masters were also of the view that there were mitigating matters, hereinafter considered, which warranted censure rather than removal from office.

The Commission made independent findings consistent with the masters' findings as to all specifications except as to the five charges the masters had found not to have been proven. As to these the Commission concluded that the Russo matter (C-1) constituted an act of wilful misconduct, and that the Ash-Hopkins matter (E-5) and matters involving transcript deletions (G-1), the mechanical canary (G-2) and Reverend Blackstone (H-3) constituted acts of prejudicial conduct. In addition the Commission concluded that the Brooks matter (C-3) constituted an act of wilful misconduct rather than prejudicial conduct as concluded by the masters.[5] Finally, the Commission concluded that there were no factors in mitigation of petitioner's misconduct.

Petitioner concedes the propriety of many of the Commission's findings, although she disputes in almost every instance the Commission's conclusions. ■ It is for us, however, to make the final findings of fact and conclusions of law in determining what discipline, if any, is to be imposed. (*Geiler v. Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 276, 283-284 [110 Cal.Rptr. 201, 515 P.2d 1].) In doing so we will adopt particular findings of the Commission or of the masters but we will not, in all instances, set those findings out in detail when no purpose is served in doing so. Particular conduct, however, we deem to be of such significance that it must be fully exposed.

of petitioner's remarks. (H-5.) Finally it is charged that in 1974 petitioner summoned maintenance and security personnel to her apartment to lodge a complaint. During a half hour confrontation she directed profanities to the manager, including, "I'm going to shoot you, George, you son of a bitch. And you are going to slowly die."

[5]Attached hereto as an appendix is a chart displaying in graphic form the findings and conclusions by both the masters and the Commission.

Petitioner's conduct is particularly significant in her dealings with public defenders who appeared before her in preliminary hearings. We have set out in the margin extracts from court proceedings pertaining to the Ridgeway (A-1, B-1),[6] Ryan (A-2, B-1),[7] Karagozian (A-3, B-1),[8]

[6]1. On November 30, 1972, during cross-examination of a witness by Deputy Public Defender Tod Ridgeway in the preliminary hearing of People v. Harold Leroy Lovin and Donald R. Fisher, No. A-290837 (a burglary charge), the following occurred:

"Q [Mr. Ridgeway] Was the credit card that you saw after you removed his wallet—was it a Tropicana credit card?

"A I don't recall which card it was.

"Q [Mr. Ridgeway] I will call off the credit cards and try to—

"THE COURT [petitioner]: You will not name off the credit cards. Please proceed with another question.

"Q [Mr. Ridgeway] Was it a Sands credit card?

"THE COURT: Perhaps you didn't hear the Court's ruling, Mr. Ridgeway.

"MR. RIDGEWAY: I think—

"THE COURT: Answer the question. Did you or did you not hear the Court's ruling?

"MR. RIDGEWAY: Yes, your Honor. I heard the ruling. I think—

"THE COURT: Then are you asking—are you asking for what I think you are asking for? I have gone through this yesterday. You had your last chance. Today is the day, and I think now is the time. Are you ready?

"MR. RIDGEWAY: I don't understand, your Honor.

"THE COURT: Take Mr. Ridgeway into custody. Get another Public Defender forthwith.

"MR. RIDGEWAY: Your Honor, I would like to object for the record.

"THE COURT: Overruled.

"May we have Lovin and Fisher to the counsel table in that order, please?

"The record will reflect that defendant Lovin is now represented at this preliminary examination by Deputy Public Defender Sandra Wruck.

"Miss Wruck, are you ready to proceed or do you want more time for preparation?

"MISS WRUCK: Your Honor, I believe I am ready. May the record reflect I am—

"THE COURT: Are you or are you not ready?

"MISS WRUCK: I am ready."

2. Mr. Ridgeway was immediately removed from the courtroom and transported by deputy marshals to the county jail.

[7]About 10:15 a.m. on April 6, 1973, the preliminary hearing of People v. Payne, Glover, and Wells, Jr., No. A-295611 (an 11-count kidnap-rape case), was transferred into Division 36 of the Los Angeles Municipal Court.

2. Deputy Public Defender John L. Ryan was assigned to represent defendant Sylvester Payne.

3. The case was transferred to petitioner's division of that court about 10:45 a.m.

4. At 11:02 a.m. Mr. Ryan informed petitioner that he was not ready to proceed and needed more time to prepare. Mr. Ryan then departed for the court employees' lounge to begin his preparation of the case and to investigate a possible conflict of interest. Mr. Ryan did not inform petitioner that he was leaving the court or that he was concerned about a possible conflict of interest.

5. Petitioner called the case at 11:36 a.m. and Mr. Ryan was not present. Petitioner then ordered a bench warrant, $25,000 bail, for Mr. Ryan held until 2 p.m. Petitioner then attempted to telephone Mr. Ryan at his office. Mr. Ryan testified that the secretary who received the call told him that petitioner was on the telephone and "wanted to talk to me in chambers about the case." Mr. Ryan told the secretary to inform the judge, "I

[8]Footnote 8 commences on page 687.

did not speak about my cases off the record, nor did I speak about my cases in chambers."

6. Petitioner thereupon ordered the bench warrant served upon Mr. Ryan.

7. Mr. Ryan learned of the bench warrant and appeared in petitioner's court about noon. As Mr. Ryan entered the courtroom, petitioner made an order appointing Deputy Public Defender Maitland Montgomery to represent defendant Payne. Such order was made without consulting Mr. Ryan. Mr. Montgomery, or the defendant. Mr. Montgomery said he did not think he could be ready by 2 p.m. as directed.

8. Immediately thereafter, the following occurred:

"THE COURT: All right, now, I've had enough of this nonsense, Mr. Ryan.

"MR. RYAN: What nonsense, your Honor?

"THE COURT: Mr. Ryan, as it happens, I am not your witness. And you are not cross-examining the Court. I haven't yet heard an apology for your abominable behavior.

"MR. RYAN: I would apologize if I knew what that behavior was, your Honor.

"THE COURT: All right. You are held in contempt of court. Found in direct contempt of court in the immediate view and presence of the Court. And you are ordered into custody. Bail is set at $25,000.

"MR. RYAN: Thank you, your Honor.

"THE COURT: You're welcome.

"Now, am I going to have to appoint private counsel to represent Defendant Payne?

"MR. MONTGOMERY: I have—I have no idea, your Honor."

9. Mr. Ryan was taken into custody about noon and held in the court lockup for about 45 minutes until released on a writ of habeas corpus.

[8]1. On May 3, 1973, in petitioner's division of the Los Angeles Municipal Court, Deputy Public Defender Michael Karagozian was representing the defendant in the preliminary hearing of People v. Robert Paul Dunn, No. A-296476 (two counts of passing bad checks.)

2. During cross-examination of a prosecution witness by Mr. Karagozian, the following occurred:

"Q [By Mr. Karagozian] What location in the restaurant did he sign these checks?

"A Two of the checks that we accepted were signed in front of me at the bar.

"Q Now, this is two separate occasions; isn't that correct?

"A The two that were given to me as evidence, those are two of—

"Q Well—

"THE COURT [petitioner]: Let him finish.

"Now, Mr. Karagozian, I don't want you continually interrupting the witness.

"MR. KARAGOZIAN: That answer isn't responsive to my question, your Honor.

"THE COURT: Mr. Karagozian, as I told you yesterday and as I have told you for the last time, that is for the Court to determine and not for you to determine. Do you understand that?

"MR. KARAGOZIAN: Yes, your Honor.

"THE COURT: Will you oblige with the question and the portion of the answer, please Miss Reporter?

[Question and Answer read.]

"THE COURT: Will you please finish your answer.

"THE WITNESS: The two that were given to me were given to me at the bar and signed in my presence.

"THE COURT: At one time or at two different times?

"THE WITNESS: Two different times.

"MR. KARAGOZIAN: May I continue, your Honor?

"THE COURT: You may,

"All right. Mr. Karagozian, did you bring your toothbrush? Are you ready to suffer the

Putnam-Price (A-4, B-1, F-3),[9] Henley (B-1, D-1, F-5),[10] Kroneberger-Weiss-Fleishman (B-2, F-4),[11] and Ingber (B-3)[12] matters. In some instances, we have included, in addition to extracts from the trial transcripts, factual statements in explanation of the circumstances then prevailing. Each of the extracts and the factual statements as related constitute a finding of fact made by the masters, by the Commission, and now by us. Petitioner does not challenge any of such findings.

consequences for being contemptuous to the court, because that is what you are being?

"MR. KARAGOZIAN: Well, your Honor, at this point I would like to say that I am trying to give the best defense possible that I can to my client.

"THE COURT: Mr. Karagozian, why don't you try opening your ears and closing your mouth for a bit. I have warned you, and you take no heed.

"Please rise.

"MR. KARAGOZIAN: Yes, your Honor.

"THE COURT: Put your hands down to your sides.

"MR. KARAGOZIAN: Your Honor, at this time I would like to inform the Court that I am not a child, and that my demeanor—

"THE COURT: All right. You are held in contempt.

"Forthwith, Mr. Bailiff. Forthwith.

"Will you bring Mr. Kascoutas in, please. Take care of Mr. Karagozian forthwith.

"Mr. Kascoutas, will you please prepare Dunn forthwith.

"MR. KASCOUTAS: Yes, I am going to."

3. Mr. Karagozian was immediately taken into custody and booked in the county jail on a commitment stating he was held "upon a charge of contempt," which made no reference to bail in any amount and specified no punishment.

[9]1. On July 12, 1973, Deputy Public Defender Vernon L. Putnam was representing the defendant in the preliminary hearing of People v. Homer Moore, No.¹A-298498 (charges of violations of Health & Saf. Code, §§ 11378, 11351, 11357).

2. Mr. Putnam made a motion to petitioner to exclude a police officer. The deputy district attorney announced that the officer would not be called as a witness. Whereupon the following occurred:

"MR. PUTNAM: I would like him excluded, well, if not under 867 then perhaps the Court would permit me to clear the courtroom under 868. I may wish to call him.

"THE COURT: You know you are not going to call him. Please don't lie to me.

"MR. PUTNAM: I may wish to call him.

"THE COURT: Please don't make these phony motions, and don't lie to me in open court. Now, Paul James did that to me, and he had better not do that again, and none of you had better do that to me again, lying to me in open court. Is there anything further in support of your motion? Do you wish to clear the courtroom?

"MR. PUTNAM: Yes, I do, your Honor.

"THE COURT: The courtroom is cleared. I am tired of these obstructionist tactics. You have no intention whatsoever of calling that person. I have had this practiced on me by Public Defender after Public Defender, and in particular participated in by Paul James of your office who lies to me in open court. I am tired of this practice.

"All right, the court is in recess for five minutes. Nobody is to leave the courtroom, and nobody is to use the phone.

[Recess taken.]

"THE COURT: Mr. Putnam, you are held in contempt of court. Mr. Bailiff, will you

[10]Footnote 10 commences on page 689.

[11]Footnote 11 commences on page 690.

[12]Footnote 12 appears on page 692.

please take Mr. Putnam into custody.

"Mr. Pine, will you please prepare the case forthwith. I should advise you in advance that I will not put up with any more obstructionist policies. Will you please bring in the people.

"MR. PINE: I am ready at this time, your Honor. .

"THE COURT: Thank you. You are still under oath, of course. Please state your name again for the record.

"THE WITNESS: Donald H. Barfield.

"THE COURT: Thank you. Please proceed.

[DIRECT EXAMINATION]

BY MR. MONTES

"Q Officer Barfield, directing your attention to June 24, 1973, would you state for the Court your occupation and assignment on that date. .

"A Police Officer for the City of Los Angeles assigned to Wilshire Uniform Patrol.

"MR. PINE: Your Honor, at this time I really do intend to call the other officer.

"THE COURT: All right, Mr. Pine, you are held in contempt of court.

"Take Mr. Pine into custody.

"THE DEFENDANT: Pardon me, your Honor— ·

"THE COURT: Hold it.

"The court is in recess for five minutes. The same admonition to the bailiff. [Recess taken.]"

3. In holding Mr. Putnam and Mr. Pine in contempt, respondent did not make an order reciting the facts and prescribing the punishment.

10 1. On July 6, 1973, Deputy Public Defender Maryanna Henley was representing the defendant in the preliminary hearing of People v. Earl Anthony Conway, No. A-297965 (charge of violation of Health & Saf. Code, § 11359).

2. During the examination of a police officer, Mrs. Henley stated that she wished to ascertain whether or not a narcotics informant would be available at the time of trial. Thereupon the following occurred:

"THE COURT [Petitioner]: Was he with you at the time of the arrest?

"THE WITNESS: No, your Honor. He was downstairs.

"THE COURT: Thank you.

"Please proceed with a proper line of questioning.

"MRS. HENLEY: Your Honor, may I state for the record that—

"THE COURT: I have ruled on this. It better not be something on this ruling.

"Please proceed with the proper question.

"BY MRS. HENLEY:

"Q Officer, did you inquire of Mr. Stevens as to his plans for the future regarding his residence, particularly whether he would be in the state or this particular location?

"THE COURT: Will you oblige with the question please, Mr. Reporter?

[The question was read.]

"THE COURT: Did you bring your toothbrush?

"MRS. HENLEY: I beg your pardon?

"THE COURT: Did you bring your toothbrush?

"MRS. HENLEY: To court today, your Honor?

"THE COURT: Yes.

"MRS. HENLEY: No, ma'am.

"THE COURT: I think you better get it right now.

"Have you heard the Court's ruling on this line of questioning? This line of questioning is not permitted.

"Will you please proceed with a proper line of questioning forthwith?

"MRS. HENLEY: Your Honor, am I to understand—

"THE COURT: You are to proceed with a proper line of questioning forthwith.

"MRS. HENLEY: Your Honor, I am somewhat at a loss here. May I inquire as to

specifically the line of questioning which I may not pursue?

"THE COURT: I can see you are not able to read, as indicated by your reference to the Evidence Code. Is it also true that you cannot hear?

"MRS. HENLEY: I am certain I heard what your Honor said, but I am equally certain I do not understand what—

"THE COURT: Will you oblige with the record, please, Mr. Reporter?

[The entire record was read.]

"THE COURT: Thank you.

"May we please proceed?

"MRS. HENLEY: Your Honor, it is not my intention to aggravate the Court; however, I am at a loss as to exactly what line of questioning it is that I may not pursue. If the Court would oblige—

"THE COURT: You heard the record. We have had the record read. If you can't tell from that, then you are not qualified to represent the defendant.

"Do you wish to be replaced?

"MRS. HENLEY: Following your Honor's line of logic—

"THE COURT: Will you answer the question, please?

"MRS. HENLEY: —the logic being if I do not understand I am—

"THE COURT: Be seated forthwith.

"Get Mr. Gits forthwith.

"MR. MAYMAN: Mr. Montes went up to get Mr. Gits.

"THE COURT: Thank you.

[Short pause.]

"THE COURT: Mr. Gits, you are substituted for Mrs. Henley.

"MR. GITS: Yes, your Honor.

"I will need time to prepare the case, your Honor.

"THE COURT: You will prepare right now.

"MR. GITS: Yes, your Honor.

"THE COURT: You will oblige with the record, Mr. Reporter.

"Please be seated in the back, Mrs. Henley.

"MR. GITS: Your Honor, may I have the record read?

"THE COURT: Yes."

3. Neither Mrs. Henley nor the defendant requested or agreed to a change of counsel.

111. Private counsel Walter Louis Kroneberger, Jr., was retained by the defendant in the preliminary hearing of People v. Douglas Leroy Nelson, No. A-297879 (charge of violation of Pen. Code, § 502.7, subd. (a)(4), (e)), held on June 25, 1973.

2. Mr. Kroneberger stated to petitioner that he was not prepared to proceed for three reasons: (1) he had filed an affidavit pursuant to section 170.6 of the Code of Civil Procedure, (2) he needed a continuance to properly prepare this case, and (3) he was physically sick.

3. Petitioner ruled the affidavit was not in order and denied the motion for a continuance, whereupon the following occurred:

"MR. KRONEBERGER: I am not prepared to go to the preliminary hearing. I would ask to be relieved at this time.

"THE COURT: Thank you. You are relieved.

"Mr. Weiss, please prepare this case forthwith. You are ordered to prepare this case forthwith.

"MR. WEISS: Yes, your Honor.

"May I receive a copy of the arrest report?

"THE COURT: Yes, you may.

"MR. WEISS: May I request that this matter be trailed to 1:30?

"THE COURT: No.

"MR. WEISS: Your Honor, I also have information that the defendant is not entitled to the services of the Public Defender's office.

"THE COURT: You are ordered to prepare the case forthwith, please, Mr. Weiss.

"Mr. Weiss, you are relieved.

"Mr. Fleishman, you are ordered to prepare the case forthwith.

"MR. FLEISHMAN: I'm sorry, I would make the same motion.

"THE COURT: Please prepare the case, Mr. Fleishman. You are relieved, Mr. Weiss.

"MR. WEISS.: Thank you, your Honor.

"THE COURT: You're welcome.

"MR. FLEISHMAN: Does the Court wish to take a recess while I prepare the case?

"THE COURT: Start preparing.

"MR. FLEISHMAN: May I take the defendant in the conference room and speak to him, please?

"THE COURT: You may take him into the lockup.

"MR. WEISS: May I confer with Mr. Fleishman?

"THE COURT: No, you may not."

4. A few moments later the following occurred:

"THE COURT: The record will reflect that the defendant is represented by Deputy Public Defender Allen Fleishman.

"Will you please proceed to the case in chief.

"MR. FLEISHMAN: May I address the Court briefly?

"THE COURT: You may.

"MR. FLEISHMAN: This case involves a violation of a Penal Code which I am not perfectly familiar with. It is a violation of Section 502.7(a)(4)(e). It is not a section which commonly comes before the Public Defender's office. It involves the use of technical equipment.

"THE COURT: You advised me you are ready. Are you ready or not?

"MR. FLEISHMAN: Your Honor, I would have to say that to do my client justice—

"THE COURT: You have been over there talking to Mr. Weiss. Mr. Weiss has given you certain instructions; isn't that the case?

MR. FLEISHMAN: No, your Honor.

"THE COURT: You told me you were ready. I don't want to have any more nonsense in this matter. Are you ready or not? ·

"MR. FLEISHMAN: I would ask for a continuance until 1:30.

"THE COURT: The motion is denied. Are you ready or not?

"MR: FLEISHMAN: Your Honor, all I can say is, if your Honor orders me to proceed, I will proceed.

"THE COURT: Are you ready to proceed?

"MR. FLEISHMAN: I can do a better job if I had to 1:30.

"THE COURT: Are you ready to proceed?

"MR. FLEISHMAN: I guess I am not, your Honor.

"THE COURT: Why did you tell me you were?

"MR. FLEISHMAN: I wish at this time to address the Court to explain my predicament.

"THE COURT: Now, Mr. Fleishman, let's not have lying in open court like somebody in your office does.

"MR. FLEISHMAN: Your Honor, it is not my intention to deceive the Court. I really have had mixed feelings about this case. There is little defense that can be made.

"However, the District Attorney has enclosed opinions that, apparently, would justify the telephone company tapping the phone to see where' the calls are going. I haven't read these cases, your Honor. There is a search warrant, a technical search warrant.

"THE COURT: No notice has been given.

"People may proceed.

"MR. MAYER: Call Mr. Schmidt to the stand, please."

5. In relieving Mr. Kroneberger respondent did not consult with defendant Nelson or obtain his consent or that of the Deputy Public Defenders Weiss or Fleishman.

Petitioner challenges the Commission's findings relating to paragraph A (A-1, A-3, A-4) to the extent that it found that petitioner ordered the deputy marshals attached to her court to make special preparations to assert quick removal to the county jail of attorneys found in contempt by petitioner. The Commission found as to the Ridgeway matter (A-1) that the special preparations had been made a "week or two prior" to the date of the contempt citation. As to the other matters which occurred after the Ridgeway matter (Karagozian, A-3, and Putnam-Pine, A-4), the Commission found that such preparations had been made "prior to" the citations. Petitioner appears first to quibble that she made arrangements "three or four weeks" prior to the Ridgeway incident rather than a "week or two" prior thereto, but the record supports either version and the precise time period is not critical. Petitioner also asserts that she made no special arrangements for public defenders and wanted to be prepared "for any contemnor." There are no findings, however, that

12 1. Private counsel Joe Ingber was retained by the defendant in the preliminary hearing of People v. Robert Crane Hughes, No. A-298342'(three counts of bookmaking), held on August 27, 1973, in petitioner's division of the Los Angeles Municipal Court.

2. On that date Mr. Ingber filed an affidavit of prejudice under section 170.6 of the Code of Civil Procedure against petitioner. Petitioner refused to honor this affidavit, stating that it had not been filed timely. Whereupon the following occurred:

"MR. INGBER: May the record reflect I am standing mute on behalf of Mr. Hughes. I filed an affidavit which I believe to be properly and timely filed. Under the circumstances, I advised Mr. Hughes, I will not participate in the defense of this matter of the preliminary hearing.

"THE COURT: Thank you. The affidavit is not timely filed. The public defender is ordered to prepare Hughes forthwith.

"Mr. Hughes, you have not been excused.

"You are dismissed, if you wish, Mr. Ingber. You may represent the defendant or not as you choose.

"MR. INGBER: I advised Mr. Hughes as to what rights I believe are in his best interests.

"THE COURT: The public defender will please prepare Hughes forthwith.

"Mr. Hughes, you are ordered not to leave the courtroom. If you leave the courtroom a bench warrant will be issued; do you understand that, and your bail will be forfeited. Do you understand that Mr. Hughes?

"THE DEFENDANT: (No audible response.)

"THE COURT: Answer out loud.

"THE DEFENDANT: Yes."

3. A few moments later Deputy Public Defender Steven Hauser stated:

"MR. HAUSER: Excuse me, your Honor. May I at this time make the Court aware that it is my determination that the public defender does not qualify for the services of Mr. Hughes. He earns too much money by our guidelines.

"THE COURT: Thank you. Are you otherwise prepared in this matter?

"MR. HAUSER: Yes, your Honor."

4. Before any evidence was presented in this case, Mr. Hauser said:

"MR. HAUSER: For the record, may it be clear that I am being ordered by the Court to represent Mr. Hughes?

"THE COURT: So ordered."

petitioner made special arrangements for public defenders although there is evidence to that effect. Petitioner also complains of particular findings from which it may be inferred that she had a special interest in the treatment accorded those deputy public defenders held in contempt in her court. The record nevertheless supports findings that she inquired of her deputy marshal after his return from transporting Ridgeway to the county jail, "Did they look up his asshole?" and that when informed Ridgeway was a diabetic and would require special treatment if incarcerated she stated, "Fuck his diabetes, fuck his diabetes." Petitioner explained that her reasons for arranging that contemnors be immediately transported to the county jail was that "Past experience indicated that such persons would be writted out before—while they were in the court lockup, thereby serving no punitive function."

■ ■■■ Petitioner's remaining objection to findings of paragraph A is to findings made as to the Ryan (A-2), Karagozian (A-3) and Putnam-Pine (A-4) matters that she had failed to make an order reciting the facts constituting the contempt and prescribing the punishment.[13] It is clear that she failed to make such orders. Her objection to the findings is in reality an objection to the conclusion which we next consider, that she was required to make such orders. We adopt as our findings as to paragraph A the findings of the Commission as to each specification thereof.[14]

Petitioner particularly complains of the Commission's conclusions as to each matter a part of paragraph A that she "acted wilfully, maliciously and in bad faith in the exercise of the contempt power and also failed to comply with the provisions of Code of Civil Procedure section 1211" and to the conclusion that "Such conduct constituted wilful misconduct in office." She contends as to each matter that the Commission seeks to hold her accountable for what is at worst an erroneous judicial ruling

---

[13]Petitioner's objection in the Ryan matter extends also to a finding that she did not afford him an opportunity for a hearing to explain the reasons for his absence from the courtroom. (See fn. 7, *ante.*) She does not address her argument to such finding, however. An attorney must be afforded a reasonable opportunity to establish excuse before being held in contempt for absence from the courtroom. (*Inniss* v. *Municipal Court* (1965) 62 Cal.2d 487, 490 [42 Cal.Rptr. 594, 399 P.2d 50]; *Arthur* v. *Superior Court* (1965) 62 Cal.2d 404, 409 [42 Cal.Rptr. 441, 398 P.2d 777].)

[14]Petitioner also urges that we adopt certain findings of the special masters not found by the Commission. Although in some instances such findings are factually supported, in no instance do we deem it necessary or even helpful to adopt them. The masters' findings generally help explain petitioner's conduct but cannot be deemed to excuse or even mitigate it.

and/or decision as distinguished from "judicial misconduct" within the meaning of the pertinent constitutional provisions.

Petitioner completely ignored proper procedures in punishing for a contempt committed in the immediate presence of a court, as provided in Code of Civil Procedure section 1211.[15] This, without more, constituted an act of bad faith in each instance. Petitioner's explanation that she cannot be deemed to have failed to comply with section 1211 because that section does not provide a time when the order is to be made is without merit. (See *In re Jones* (1975) 47 Cal.App.3d 879, 881 [120 Cal.Rptr. 914].) It does not appear in any instance that petitioner made any effort to make a proper order at any time at or after the time the attorneys were cited. ■ Compliance with section 1211 is a jurisdictional requirement, "and an order which assumes to punish summarily a direct contempt of court is void unless it shows on its face facts sufficient to constitute a legal contempt." (*Arthur* v. *Superior Court, supra,* 62 Cal.2d 404, 409.) Petitioner was an experienced judge, with more than nine years on the bench before the Ridgeway matter, and she had at hand reference works which dealt with proper contempt procedures. (Cf. *Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d 778, 800-801.)

■ That petitioner's conduct constituted bad faith, moreover, is amply and independently demonstrated by clear and convincing evidence apart from her wilful failure to comply with section 1211 in citing deputy public defenders. Thus she embarked upon a program by which persons whom she knew would be entitled to release by extraordinary writ would nevertheless be subjected to the embarrassment and indignity of being charged and incarcerated as criminals; she arbitrarily cited such persons for contempt on grounds which she never sought to establish if in fact they could have been established; she demonstrated no continuing interest or judicial responsibility in the contempt proceedings after ascertaining that the public defenders had been subjected to the booking procedures;[16] and her conduct was sometimes vulgar, lacking in humane understanding and grounded on retribution and hostility.

[15]Section 1211 provides in pertinent part: "When a contempt is committed in the immediate view and presence of the court, or of the judge at chambers, it may be punished summarily; for which an order must be made, reciting the facts as occurring in such immediate view and presence, adjudging that the person proceeded against is thereby guilty of a contempt, and that he be punished as therein prescribed."

[16]Ridgeway was released after four hours by a telephone call from petitioner, who later purged the contempt citation. Ryan was released on a writ of habeas corpus before booking. Karagozian was released on a writ of habeas corpus on the same day as his

■ "The term 'bad faith' implies that the judge 'intentionally committed acts which he knew or should have known were beyond his lawful power.' [Citation.] As so used, 'bad faith' entails actual malice as the motivation for a judge's acting ultra vires. The requisite intent must exceed mere volition; negligence alone, if not so gross as to call its genuineness into question, falls short of 'bad faith.' 'Bad faith' also encompasses acts within the lawful power of a judge which nevertheless are committed for a corrupt purpose, i.e., for any purpose other than the faithful discharge of judicial duties. In sum, 'bad faith' is quintessentially a concept of specific intent, requiring consciousness of purpose as an antecedent to a judge's acting maliciously or corruptly." (*Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d 778, 795-796.) The foregoing record compels the conclusion in the instant case that petitioner's primary concerns were first to inflict a completed punishment before the deputies were afforded a due process determination that punishment was warranted and, second, to accomplish her objectives in a manner to insure that such conduct would be insulated from judicial review and collateral attack. It is manifest that such a planned subversion of justice and misuse of the judicial power could be undertaken only in bad faith. We adopt as our own the conclusions of the Commission as to each matter of paragraph A.

Paragraph B, which charges unlawful interference with the attorney-client relationship by relieving and appointing new counsel of record in on-going criminal proceedings, is supported in subparagraph B-1 by the foregoing Ridgeway, Ryan, Karagozian and Putnam-Pine matters and also the Henley matter. We have considered and rejected petitioner's objections to findings relating to the first four of these matters in support of paragraph A, and as to the Henley matter petitioner makes no objection to those findings set out in footnote 10, *ante.* In addition petitioner accepts further findings by the Commission that as to all five of these matters neither counsel of record nor the concerned defendant made application for or consented to the change of counsel, and that petitioner "without warning and without affording to counsel or the defendant any opportunity for consultation, made an abrupt change of Deputy Public Defenders." We adopt as our own findings the findings of the Commission as to subparagraph B-1.

Petitioner takes issue with the following conclusion of the Commission as to subparagraph B-1: "The change of Deputy Public Defenders in

incarceration. Putnam and Pine were released on a writ of habeas corpus after five hours in the county jail and the contempt citations were purged by petitioner the following day.

each of the foregoing cases and the substitution of private counsel in [the Putnam-Pine matter] amounted to unlawful interference by [petitioner] with the attorney-client relationship and an unwarranted interference in the operation of the Public Defenders' Office. Therefore, her actions constituted wilful misconduct in office." Petitioner first contends that the conclusion regarding an "unwarranted interference in the operation of the Public Defenders' Office" should be stricken as irrelevant since no charge of such interference was contained in the formal notice. Petitioner was charged only with an unlawful interference with the attorney-client relationship, and we agree that the conclusion of unwarranted interference with the operation of the public defenders' office, although perhaps factually supported, is not contained within the charged misconduct. (See *In re Ruffalo* (1968) 390 U.S. 544 [20 L.Ed.2d 117, 88 S.Ct. 1222].)

Petitioner also contends that the Commission erred in concluding that she "unlawfully" interfered with attorney-client relationships, arguing that a judge does have the inherent power to remove an attorney from representation after he has been held in contempt. She relies on *Smith* v. *Superior Court* (1968) 68 Cal.2d 547 [68 Cal.Rptr. 1, 440 P.2d 65]. In that case a trial court first appointed an attorney for an indigent defendant and later concluded that the attorney was not qualified to represent a defendant against whom a charge had been filed which upon conviction could lead to a possible imposition of a death penalty. The defendant, however, was satisfied that the appointed counsel could best defend him. He accordingly refused to consent to the court's substitution of counsel and in fact vigorously resisted any such substitution. In granting a writ mandating the vacation of the order substituting counsel, we held that when both the attorney and the defendant objected it was beyond the power of a judge to discharge court-appointed counsel on the ground of the judge's evaluation that counsel was incompetent because of lack of experience in trying a particular type of case. We further held that although a trial judge must protect an accused's right to effective counsel, great care should be exercised to avoid infringing on a defendant's right to counsel of his choice and compromising the independence of the bar. We noted that a court has many tools available short of discharging counsel to insure that a defendant is not prejudiced by inadequate representation and that the court's *ultimate* weapon is the summary contempt power. "Yet that power too must be exercised with great caution, lest it stifle the freedom of thought and speech so necessary to a fair trial under our adversary system. That system is built upon the belief that truth will best be served if defense counsel is given the maximum possible leeway to urge in a respectful but nonetheless determined

manner, the questions, objections, or argument he deems necessary to the defendant's case . . . ." (*Id.* at p. 560.)

We also stated in *Smith* that the inhibition imposed on a defense attorney by a threat of removal "constitutes a serious and unwarranted impairment of his client's right to counsel. It is, in the . . . language of *People* v. *Crovedi* (1966) *supra,* 65 Cal.2d 199, 206 [53 Cal.Rptr. 284, 417 P.2d 868], 'an unreasonable interference with the individual's desire to defend himself . . . .' " (*Id.* at p. 561.) Finally, we held that a different rule could not be applied merely because counsel was an indigent represented by court-appointed counsel. "It follows that once counsel is appointed to represent an indigent defendant, whether it be the public defender or a volunteer private attorney, the parties enter into an attorney-client relationship which is no less inviolable than if counsel had been retained. To hold otherwise would be to subject that relationship to an unwarranted and invidious discrimination arising merely from the poverty of the accused." (*Id.* at p. 562.)

■ *Smith* makes it abundantly clear that the involuntary removal of any attorney is a severe limitation on a defendant's right to counsel and may be justified, if at all, only in the most flagrant circumstances of attorney misconduct or incompetence when all other judicial controls have failed. Without determining whether any of petitioner's contempt citations were warranted in the instant case, it is nevertheless manifest that in none of such instances was the conduct of the deputy public defenders so flagrant that petitioner was justified in abruptly substituting counsel without the prior concurrence of the attorneys and defendants involved.[17] In making such substitutions petitioner also failed to allow reasonable time for the newly appointed counsel to prepare to defend.

It avails petitioner little to argue, as she does, that she committed no unlawful act in substituting one deputy public defender for another in the same office. The gravamen of petitioner's misconduct lies not only in the *fact* of the substitutions but also the *manner* in which they were accomplished. In some instances she thrust upon new counsel the immediate responsibility of representation in an on-going proceeding

---

[17]Code of Civil Procedure section 284 provides in pertinent part: "The attorney in an action or special proceeding may be changed at any time before or after judgment or final determination, as follows:

"1. Upon the consent of both the client and attorney, filed with the clerk, or entered upon the minutes;

"2. Upon the order of the court, upon the application of either client or attorney, after notice from one to the other."

when, so far as appears, such counsel had no prior knowledge of or acquaintance with the accused, the evidence supporting the charges, the defenses which might be available or the trial tactics and intended strategy of the attorney who was summarily removed. The accused in such instances was afforded no opportunity to consent or to state his position. Indeed, he was not even permitted to communicate with the newly appointed counsel. The attorney-client relationship was as effectively infringed as if the newly appointed counsel had no prior relationship with the counsel for whom he was substituted as no opportunity was afforded for effective continuity in the attorney-client relationship or in defending against the charges. (Cf. *People* v. *Stroble* (1951) 36 Cal.2d 615, 628-630 [226 P.2d 330].) The accused's right to counsel was thus as seriously infringed as in *Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d 270, where upon the whim of the trial judge private counsel were substituted for deputy public defenders. We stated in that case: "No more fragile rights exist under our law than the rights of the indigent accused; consequently these rights are deserving of the greatest judicial solicitude. The ideal of our legal system is that the judicial should be equated with the just. Such an ideal cannot be achieved if one man clothed with judicial power may ignore with impunity such a basic institutional mandate as the sanctity of the attorney-client relationship merely because the attorneys are young deputy public defenders and their clients are indigent." (*Id.* at p. 286.)

In view of the foregoing, our conclusion as to subparagraph B-1 is as follows: The change of deputy public defenders in each of the foregoing cases and the substitution of private counsel in People v. Moore (the Putnam-Pine matter) amounted to unlawful interference by petitioner with the attorney-client relationship. Petitioner acted in bad faith. Therefore, her actions constituted wilful misconduct in office.

Petitioner also challenges the Commission's finding in the Kroneberger-Weiss-Fleishman matter (B-2, see fn. 11, *ante*) that she intimidated Fleishman into proceeding without adequate time to prepare in that case. The matters set forth in footnote 11, *ante,* constitute clear and convincing evidence in support of such finding, and we adopt the findings of the Commission as our own as to subparagraph B-2. We conclude, as did the Commission, that the actions of petitioner taken after the denial of Kroneberger's motion for continuance were in bad faith. Consequently, such actions constituted wilful misconduct in office.

Petitioner next objects to findings made by the Commission as to the Ingber matter (B-3, see fn. 12, *ante*) that the substitution of a deputy public defender for Ingber was without the consent of the accused or the attorneys involved, and that petitioner made no effort to ascertain that the accused, who had paid Ingber in full, was eligible to be represented by the public defender. The matters set out in footnote 12, *ante,* provide clear and convincing evidence in support of the findings of the Commission which we adopt as our own as to subparagraph B-3. We conclude, as did the Commission, that petitioner's actions, after refusing to honor the affidavit of prejudice, were taken in bad faith and constituted wilful misconduct in office.

Petitioner also contends that her conduct as to all matters charged in support of paragraph B of the formal complaint is not subject to reprimand as lying within the proper scope of an exercise of judicial discretion. As earlier discussed in connection with petitioner's similar argument urged as to the matters charged in support of paragraph A of the formal notice, we reject such contention for reasons of demonstrated bad faith of petitioner.

Petitioner is charged in paragraph C with having acted unreasonably and arbitrarily in matters of bail-setting and issuance of bench warrants. The conduct in support of paragraph C is fairly summarized in the charges set out in footnote 4, *ante.* Petitioner has accepted the findings in full as to all matters alleged except as to certain of the findings of the Russo matter (C-1). We have examined the record and agree in part with petitioner's contentions. Our findings as to the Russo matter are set forth in the margin.[18] We fail to find clear and convincing evidence that petitioner acted in bad faith, but conclude as follows: Petitioner's actions in issuing the bench warrant and setting bail at $50,000 constituted

[18]1. On March 23, 1973, Richard Russo (a.k.a. Frank Dariento) was scheduled to appear in petitioner's court for a preliminary hearing on No. A-294898 (two counts of receiving stolen property and two counts involving narcotic violations). Bail had previously been set at $500.

2. Defendant failed to appear on March 23, 1973, and a bench warrant was ordered held until April 2, 1973.

3. Sometime after March 24, 1973, petitioner received a letter from Dr. Jack E. Miller of the Veterans Administration stating that the defendant was in the Veterans Hospital and unable to appear in court. In this letter Dr. Miller mentioned a telephone call to petitioner's court on the morning of March 24, 1973, and indicated that defendant was undergoing evaluation of symptoms that appeared highly suggestive of a form of meningitis. Petitioner attempted to telephone Dr. Miller but was unable to talk with him on any of the calls originating from her office.

4. Before April 3, 1973, petitioner talked with Dr. Toomajian, the medical director of the hospital board of the county jail who, based on the contents of Dr. Miller's letter, ·

conduct prejudicial to the administration of justice that brings the judicial office into disrepute.

Petitioner does not take issue with the Commission's findings as to the remaining matters in support of paragraph C. Thus she does not challenge findings that she arbitrarily revoked a dismissal and remanded an accused (Brooks) to custody when he refused to stipulate to probable cause for his arrest (C-3); that she arbitrarily revoked certification of a minor (Alcorn) to juvenile court as to certain charges and revoked bail when he refused to stipulate to a continuance of a preliminary hearing as to other charges; and that she found both the accused and his mother in contempt of court, setting bail at $100,000 as to each, when they audibly protested the aforementioned acts of revocation (C-4); and that she arbitrarily increased bail from $3,000 in steps to $50,000 when an accused (Farrell) indicated his continuing displeasure because he was not released on his own recognizance (C-7). (See factual recitals set forth in charges appearing in fn. 4, *ante,* subpar. C.) As to each of these matters (C-3, C-4 and C-7) we conclude that petitioner acted in bad faith and that such acts constituted wilful misconduct in office, adopting as our own the conclusions of the Commission.

In paragraph D petitioner is charged with engaging in conduct calculated to instill in defense attorneys a state of submissiveness and fear, thereby infringing on a defendant's constitutional right to counsel. Two matters (Henley, Dennison) are charged herein. We have already considered the Henley matter and petitioner does not challenge the findings as set out in footnote 10, *ante.* Petitioner purports to challenge the findings as to the Dennison matter (D-2) but such challenge consists only of her stated inability to remember the events as testified to by Dennison. (See factual recitals summarized in charges, fn. 4, *ante,* par. D.) We adopt the findings of the Commission as our own, and conclude, as does the Commission in each instance, that petitioner's conduct was

---

advised that Russo's problem could be better treated at the county jail hospital.

5. On April 3, 1973, petitioner's clerk answered a telephone call and told petitioner it was from a doctor at the Veterans Hospital. Picking up the telephone, petitioner stated, "That is entirely unsatisfactory. Unsatisfactory."

6. After this telephone call, petitioner immediately took the bench, ordered the bench warrant served, and set bail at $50,000.

7. The defendant was brought to court on April 4, 1973, bail remained at $50,000 and the preliminary hearing was scheduled for April 17, 1973. When the defendant was taken into custody on the bench warrant, representatives of the sheriff's office furnished the Veterans Hospital with a written assumption of responsibility for the defendant's "health care."

8. At the preliminary hearing on April 17, 1973, the defendant was held to answer and bail was continued at $50,000.

arbitrary, unreasonable and in bad faith, and constituted wilful misconduct in office.

Petitioner is charged in paragraph E with abusing the prerogatives of her high office. We are particularly distressed by the Fagin matter (E-1) and have set out in the margin the findings and conclusions of the Commission, none of which is challenged by petitioner, and which we adopt.[19] Petitioner also does not challenge the Commission's findings as to any of the other matters in support of paragraph E. (See summary of factual matters set forth in charges, fn. 4, *ante,* par. E.) Thus petitioner

---

[19]About 7:45 a.m. on November 30, 1972, Police Officer Richard G. Fagin spoke to petitioner at the intersection of Spring and Arcadia Streets in Los Angeles about the excessive use by petitioner of her automobile horn at the preceding corner. The following conversation occurred between petitioner and Officer Fagin at that time.

"[Officer Fagin] She rolled down her window when I pulled up alongside her, at which time I said, 'Ma'am, there is no reason to honk your horn.'

"I said, 'The gentleman was just waiting for a pedestrian, like he should have.'

"At which time she told me she would honk her horn any time she damn well pleased.

"At that time I said, 'Ma'am, there is a Vehicle Code Section that covers excessive use of the horn.'

"At which time she told me, 'You go to hell, Officer.' "

2. Upon arriving in her chambers shortly thereafter petitioner said to her bailiff, Robert Douillard, "Find the son of a bitch; I want him found and brought in right away. Give me a gun; I am going to shoot his balls off and give him a .38 vasectomy."

3. At about the same time, petitioner said to her other bailiff, Steven Day, "God damn, get that son of a bitch here; find that bastard; I'm not going to start court until that son of a bitch is here; when I find him, I'm going to cut off his balls and have them hang over my bench; I'm going to castrate him; I'm going to give him a vasectomy with a .38." These statements were repeated to Officer Day several times.

4. Petitioner and Officer Day then went to the police officer's waiting room in the courthouse, where petitioner spoke to Sergeant Paul Holmes, stating, "God damn it, find him, find that son of a bitch for me. I am not going to take the bench until you find that male chauvinist pig."

5. Shortly thereafter, various police officers began to arrive at petitioner's chambers, including Sergeant Paul Holmes, Lieutenant James W. Holcomb, and Captain James D. Munger. At this time and with these police officers in her presence, petitioner instructed her bailiffs, "God damn it, no one is to leave, if anyone tries to leave, shoot the bastard." Petitioner appeared to be hysterical at this time and her voice was harsh and loud. While these officers remained in her chambers, petitioner said she could sound her "God damn horn any place in the city and no male chauvinistic officer" could tell her otherwise. Petitioner further stated, "I'd like to slap that mustache off that officer's face for what he did. We have too many of these motor officers out there laying their pecker on the line for their pay checks."

6. Later the same morning, Officer Fagin arrived at petitioner's court and stood outside the chambers. He could hear petitioner "yelling at Sgt. Holmes." After about 10 minutes he entered chambers. We find the following testimony of Officer Fagin to be true:

"Q And would you relate as best you can the substance of the conversation that took place at this time and place?

"A Yes, sir. I walked into the chambers and I stood behind my chair, and Judge Cannon said 'Good morning, Officer,' and I said, 'Good morning.'

"She said, 'Have a seat,' and I said, 'Thank you,' and I sat down, at which time we

acknowledges that she verbally abused a police officer (Laird) because he made inquiry as to the dismissal of a criminal complaint following petitioner's interruption of a preliminary hearing for the purpose of reading the police report of the arrest (E-4), and that she ordered deputy public defenders (Ash-Hopkins) into custody while they conducted interviews with clients prior to arraignment proceedings (E-5). Accordingly, we adopt the Commission's conclusion as to each of such matters (E-4, E-5) that petitioner's conduct constituted acts prejudicial to the administration of justice that brings the judicial office into disrepute.

just—there was a momentary silence for about 30 seconds; we just looked at each other, because I did not know what to say or do.

"Her opening statement was, 'You've been a very naughty boy.'

"And I stated 'Well, if you say so, your Honor.'

"She said, 'What do you mean, if I say so?'

"I said, 'Well, you are the Judge.'

"At this time we just talked about things in general, such as public defenders and court cases and how the public defenders ask some ridiculous questions like, 'Officer, did you have your gun out when you did this? Did you have your gun out when you did this?'

"She said, 'There is nothing but a revolving door here,' she said, 'All of these people are going to be back, they just come in and out.'

"Then it was—she just changed. The conversation changed back and forth.

"Then she started talking about some religious seminar that she attended over some holiday, just a couple of weeks prior to this, I presume, and she started going through some religious pamphlets that she had, and told me that she wanted me to have a copy of it, and she looked for a copy of it and she could not find one. She gave me her own personal copy of a couple of these pamphlets and told me to look at the dog-eared pages of the pamphlets in my spare time.

"She also stated the guillotine had been used in France again; she wished it would be brought back in the United States.

"Q Now, did she ever ask you to apologize during this conversation?

"A No, sir.

"Q And did you leave with how many pieces of religious brochures?

"A Three or four.

"Q And later on did you receive a letter of commendation from Judge Cannon?

"A Yes, sir, I did.

"Q How many weeks after this incident was this?

"A Two weeks.

"Q And could you relate in essence the substance of this letter of commendation?

"A Yes, sir, it was just addressed to Chief Davis, Chief of Police, and it said the Los Angeles Police Department is the finest in the world, and the motor T.E.D. motor squad was the finest of L.A., and Officer Fagin was the finest of the fine, and it was signed Noel Cannon."

7. The police officers finally left petitioner's chambers that morning shortly before noon.

CONCLUSION:

Petitioner's conduct was arbitrary, unreasonable and in bad faith, and constituted wilful misconduct in office. Petitioner not only used profane, abusive and inexcusable language, but she also misused the authority of her office by ordering persons to appear in her court where no matters were pending requiring their attendance and by directing her bailiffs to use force if they attempted to leave.

Paragraph F charges that petitioner engaged in curt and rude conduct by ridiculing qualified members of the bar. Petitioner concedes the truth of the Commission's findings that she deliberately ridiculed Deputy Public Defender Klein (F-1, see summary of factual matters set forth in charges, fn. 4, *ante,* par. F) and accepts the Commission's conclusion that her conduct was arbitrary, unreasonable and in bad faith, and constituted wilful misconduct in office. Petitioner also accepts the Commission's findings as to the Shalant matter but objects to the Commission's conclusion that her conduct was prejudicial to the administration of justice. The findings in the Shalant matter well support the charges as summarized in footnote 4, *ante,* paragraph F, and constitute clear and convincing evidence in support of the conclusions of prejudicial misconduct. We accordingly adopt the findings and conclusions of the Commission as our own as to the Klein and Shalant matters. We have heretofore made findings as to the Putnam-Pine matter (F-3), the Kroneberger-Weiss-Fleishman matter (F-4) and the Henley matter (F-5) and as to each of such matters we adopt the Commission's conclusion that petitioner engaged in curt and rude conduct by deliberately ridiculing these members of the bar, and that such constituted wilful misconduct in office.

Petitioner accepts the Commission's findings of paragraph G to the effect that she unlawfully ordered the court reporter to delete material from the transcript of a preliminary hearing matter. (See summary of factual matters set forth in charges, fn. 4, *ante,* par. G.) She objects, however, that the Commission has reached a conclusion which is not related to the charge of the formal notice. We do agree that a charge that petitioner unlawfully ordered the deletion of material from a transcript does not warrant the conclusion, as made by the Commission, that petitioner's direction to the reporter to turn over his notes to the clerk of the municipal court rather than the county clerk, was a violation of Government Code section 69955, subdivision (a). We agree with and adopt as our own, however, the Commission's further conclusion, as follows: Petitioner's conduct in ordering a portion of the record deleted in People v. Moore was a violation of Code of Civil Procedure section 274c, and constituted conduct prejudicial to the administration of justice that brings the judicial office into disrepute.

Paragraph H charges certain bizarre conduct on petitioner's part. We do not deem some of such admitted conduct, although bizarre in character and clearly improper in a judicial atmosphere, to constitute either wilful misconduct or prejudicial conduct. This includes the

maintenance at particular times of a mechanical canary in petitioner's chambers (H-2) and a small dog at her bench (H-3). The record fails to disclose that either the canary or the dog had any substantial effect on proceedings in petitioner's court. A more serious charge is that petitioner engaged in improper conduct in 1967 when she maligned her colleagues on the bench after they had censured her for certain exhibitionist conduct and statements to the media which she now recognizes as being "foolish." The Commission's findings which support the charge are accepted by petitioner. It appears, however, that such conduct was the subject of a letter from the Commission in 1967 and that petitioner has not engaged in similar conduct since that time. We elect not to include her 1967 conduct as a ground for further disciplinary action in these proceedings.

There is other bizarre conduct which we cannot ignore. Petitioner does not object to Commission findings that she arranged for Reverend Blackstone to use an interview room within the lockup area adjacent to petitioner's courtroom for the purpose of religious interviews with all persons in custody. Petitioner now acknowledges "that religion in any form should not be injected into the judicial process." We adopt as our own the Commission's findings and conclusions that petitioner's conduct was prejudicial to the administration of justice and brings the judicial office into disrepute.

Petitioner does not challenge Commission findings in support of the Belfry matter (see factual matters as set forth in charges as summarized in footnote 4, *ante,* par. H (H-5)), although she rejects the Commission's conclusion that she is guilty of prejudicial conduct as to that matter. As the findings are based on clear and convincing evidence and support the Commission's conclusion we adopt both the findings and conclusion as our own. Petitioner does object to Commission findings in support of the charge summarized in footnote 4, *ante,* paragraph H (H-6) that she threatened to shoot the manager of her apartment, but she objects only to a particular finding that a maintenance man who was present was frightened by petitioner's conduct. There is clear and convincing evidence in support of the Commission's finding and also the conclusion of prejudicial conduct, and we adopt both the findings and conclusion as our own. Petitioner's contention that conduct within the privacy of her apartment cannot constitute conduct which brings the judicial office into disrepute overlooks the fact that the charged misconduct was brought out of the privacy of her apartment when the apartment manager, the maintenance engineer and the security guard were summoned there and

detained by petitioner while she stated her complaints at length in a loud voice.

The foregoing numerous incidents of wilful misconduct and less serious prejudicial conduct[20] constitute compelling grounds for petitioner's removal from office. Petitioner urges in mitigation, first, "the unanimous conclusion of all who testified [in her behalf] that Petitioner was a hard working judge who puts in long hours because of a lengthy calendar." Also urged in mitigation are her "contrition for her admitted abrasive conduct," her "courteous and respectful attitude and demeanor" in most of her work, her "intelligence and capacity for continued growth" as a judge, her efficiency in managing a heavy case load, her capacity for impartial decisions and long working hours, her "unquestioned integrity," and the "inexperience and sometimes disrespectful attitude of public defenders" who appeared before her.[21]

Seventeen private attorneys, one deputy district attorney and a public official testified in behalf of petitioner. A consensus of the testimony of the attorneys was to the effect that in appearances before petitioner they had observed no conduct which constituted a denial of effective counsel or an interference with the attorney-client relationship, that she did not act in a curt, rude or biased manner, that she did not set unreasonable bails or arbitrarily issue arrest warrants, that she did not instill in defense attorneys fear or submissiveness, and that she was a well-qualified and conscientious judge. It appears, however, that all of such opinion evidence except, perhaps, the opinion that petitioner was a well-qualified and conscientious judge, has been established to the contrary by clear and convincing evidence in these proceedings. We cannot embrace such conclusionary expressions in view of a record which refutes each such expression in instances too numerous to permit us to speculate that petitioner was guilty of misconduct only in isolated occasions which might be individually explained and excused. None of the attorneys was

---

[20]"The more serious charge should be reserved for unjudicial conduct which a judge acting in his judicial capacity commits in bad faith, while the lesser charge should be applied to conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office." (*Geiler* v. *Commission on Judicial Qualifications,* *supra,* 10 Cal.3d 270, 284.)

[21]The special masters made the following statement in support of their recommendation for censure: "The Special Masters have concluded on the basis of all the evidence that [petitioner] is capable of continuing in her judicial position and functioning as a responsible, effective judge, and that she can and will avoid a repetition of the conduct which is the basis of the recommendation for censure. It is with that belief that the Special Masters make their recommendation."

present in petitioner's court on the occasion of any misconduct charged herein.

It is also urged that petitioner has heard far more than her fair share of preliminary hearings and arraignments during the period in which her conduct has been questioned; that she kept her court in session for long hours, generally convening by 8:30 a.m. and occasionally working through lunch or into evening hours, and that she has averaged only a few days' annual vacation and sick leave. There is no reason to doubt the truth of these assertions. Judge Spruance (*Spruance v. Commission on Judicial Qualifications, supra,* 13 Cal.3d 778, 801) unsuccessfully sought to mitigate his misconduct on grounds of overwork and unusual judicial pressures. Petitioner asserts that she often sought reassignments from other departments when her calendar had cleared; it thus does not appear that it was the pressures of her assigned work load which forced her into the improprieties charged and found. It is manifest in any event that a lack in the quality of justice cannot be balanced by the fact that justice, such as it is, is administered in large quantities.

Petitioner also seeks to mitigate her conduct on frustrations provoked by "inexperienced and sometimes disrespectful lawyers" from the office of the public defender. With one possible exception, however, the record simply does not support her claim that the numerous deputy public defenders involved in the misconduct charged and found to be true were disrespectful or that their inexperience reasonably could have frustrated petitioner or have provoked her unwarranted conduct. (See fns. 6-12, *ante.*) Nor does the record support a contention that the deputy public defenders engaged in a "vendetta" designed to provoke petitioner or to obstruct the administration of justice in her court. Punitive action against the deputy public defenders, including contempt citations, was petitioner's first and not as it should have been her last means of controlling proceedings in her courtroom. (See *Smith v. Superior Court, supra,* 68 Cal.2d 547, 560.) "[E]ven assuming arguendo that the evidence was clear and convincing, disrespect on the part of the public defender cannot serve to justify petitioner's injudicious response." (*McCartney v. Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 538 [116 Cal.Rptr. 260, 526 P.2d 268].)

We deem none of the foregoing or other matter urged by petitioner to constitute a factor which we may recognize in mitigation of petitioner's numerous acts of wilful misconduct. We stated in

*Spruance,* with equal applicability here, that we cannot "conceive that there are circumstances in which bad faith itself can be excused by extraneous circumstances. There can be no mitigation for maliciously motivated unjudicial conduct. Since we have found petitioner to have acted in bad faith on numerous occasions, we obviously have given no credit to petitioner's asseverations of mitigating circumstances." (*Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d 778, 800.) Petitioner has engaged in a course of conduct which has maligned the judicial office and clearly establishes her lack of temperament and ability to perform judicial functions in an even-handed manner. Because it is our duty to preserve the integrity and independence of the judiciary (Cal. Code Jud. Conduct, canon 1), we order Judge Noel Cannon of the Municipal Court for the Los Angeles Judicial District of Los Angeles County removed from office.[22] This order is final forthwith.

As petitioner's unjudicial conduct did not amount to moral turpitude, dishonesty or corruption (cf. Bus. & Prof. Code, § 6106) justice will not be further served by prohibiting petitioner from resuming the practice of law. We therefore further order that notwithstanding her removal from

---

[22]The California Code of Judicial Conduct was adopted by the Conference of California Judges effective January 1, 1975. We do not rely on the code in ascertaining violations thereof as grounds for disciplining petitioner; discipline is imposed pursuant to the constitutional provisions and rules in implementation thereof heretofore noted and considered. However, we acknowledge the applicability of the code to any conduct we as judges participate in after its effective date. Canon 1 provides in part that "An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved."

We note that although the current California Code of Judicial Conduct has only recently been adopted, formal standards have nevertheless existed for more than 50 years. The original American Bar Association Canons of Judicial Ethics were adopted as modified in 1949 for application in California by the Conference of California Judges. The current California Code of Judicial Conduct is adapted from the ABA Code of Judicial Conduct which, after revision of the association's earlier code, was adopted by the ABA in 1972. (See Cal. Rules of Court, appendix, div. II, Cal. Code Jud. Conduct; *Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d 270, 281-282; *Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d 778, 796, fn. 17.)

Although as stated, petitioner is not charged with its violation we nevertheless note the content of canon 2, the substance of which has long been incorporated in various ABA canons of judicial conduct: "A judge should respect and comply with the law and shall conduct himself at all times in a manner that promotes public confidence in the impartiality of the judiciary." We stated in *Spruance* that "the canons of the American Bar Association's Code of Judicial Conduct might usefully be consulted to give meaning to the constitutional standards." (*Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d 778, 796.)

judicial office Noel Cannon shall, if otherwise qualified, be permitted to practice law in the State of California. (See Cal. Const., art. VI, § 18, subd. (d).)

## APPENDIX

### FINDINGS AND CONCLUSIONS BY MASTERS AND COMMISSION

| Paragraph, Formal Notice | Specific Charge Verbal Designation | Item No. | Findings/Conclusions By Masters | | | Findings/Conclusions By Commission | | |
|---|---|---|---|---|---|---|---|---|
| | | | Wilful Misconduct | Prejudicial Conduct | Neither | Wilful Misconduct | Prejudicial Conduct | Neither |
| A-Abuse of contempt power | Ridgeway | A-1 | X | | | X | | |
| | Ryan | A-2 | X | | | X | | |
| | Karagozian | A-3 | X | | | X | | |
| | Putnam-Pine | A-4 | X | | | X | | |
| B-Unlawful interference with attorney-client relationship | Ridgeway (Ryan), Karagozian), Putnam-Pine), Henley), Kroneberger-Weiss-Fleishman | B-1 | X | | | X | | |
| C-Arbitrary bail | Ingber | B-2 | X | | | X | | |
| | Russo | B-3 | X | | | X | | |
| | Brooks | C-1 | | | X | X | | |
| | Alcorn | C-3 | | X | | X | | |
| | Farrell | C-4 | X | | | X | | |
| D-Instilling submissiveness in attys. | Henley | C-7 | X | | | X | | |
| | Dennison | D-1 | X | | | X | | |
| | | D-2 | X | | | X | | |
| E-Abuse of prerogatives of office | Fagin | E-1 | X | | | X | | |
| | Laird | E-4 | | X | | | X | |
| | Ash-Hopkins | E-5 | | | X | | X | |
| F-Ridiculing members of bar | Klein | F-1 | X | | | X | | |
| | Shalant | F-2 | | X | | | X | |
| | Putnam-Pine | F-3 | (1) | | | X | | |
| | Kroneberger-Weiss-Fleishman | F-4 | (1) | | | X | | |
| | Henley | F-5 | (1) | | | X | | |

## APPENDIX

### FINDINGS AND CONCLUSIONS BY MASTERS AND COMMISSION

| Paragraph. Formal Notice | Specific Charge Verbal Designation | Item No. | Findings/Conclusions By Masters | | | Findings/Conclusions By Commission | | |
|---|---|---|---|---|---|---|---|---|
| | | | Wilful Misconduct | Prejudicial Conduct | Neither | Wilful Misconduct | Prejudicial Conduct | Neither |
| G-Deletion of transcript material | | G-1 | | | X | | X | |
| H-Bizarre conduct | Resolution of censure | H-1 | | X | | | X | |
| | Canary | H-2 | | | X | | X | |
| | Dog | H-3 | | X | | | X | |
| | Rev. Blackstone | H-4 | | | X | | X | |
| | Belfry | H-5 | | X | | | X | |
| | Apt. manager | H-6 | | X | | | X | |

(1)—Not specifically found in indicated context but so found under an earlier listing.

Note—Specifications not found by the Commission and therefore dismissed are not dealt with in the text of the opinion nor included on this chart.