*CJP Supp. 3 Opinion
GROSSMAN, Vice-chairperson.
This disciplinary matter concerns Judge Joseph W. O’Flaherty of the Placer County Superior Court. Judge O’Flaherty *CJP Supp. 4 is represented by James A. Murphy, Esq., and Harlan B. Watkins, Esq., of Murphy, Pearson, Bradley & Feeney of San Francisco, California. The examiners for the commission are Jack Coyle, Esq., and Bradford Battson, Esq.
In section I, we set forth the masters’ final report in its entirety and adopt it (except as noted in fn. 1, at p. 6, post) as the foundation for the commission’s decision in this matter. In part II, we discuss Judge O’Flaherty’s legal arguments concerning our authority to discipline him, followed in part III by the reasons for our determination to issue this public admonishment.
I
ADOPTION OF MASTERS’ FINDINGS AND CONCLUSIONS
The special masters appointed by the Supreme Court are Hon. Sandra L. Margulies, Associate Justice, Court of Appeal, First Appellate District, Division One, Hon. Michael T. Garcia, Judge of the Superior Court of Sacramento County, and Hon. Donald Cole Byrd, Judge of the Superior Court of Glenn County. With the one exception noted hereafter, the commission hereby adopts the masters’ final report, filed with the commission on May 20, 2004, as its own findings and conclusions. The following text of the masters’ report constitutes the commission’s own findings and conclusions.
“INTRODUCTION
“By its Notice of Formal Proceedings, the Commission on Judicial Performance (the Commission) has charged Placer County Superior Court Judge Joseph W. O’Flaherty with two counts each of willful misconduct in office, conduct prejudicial to the administration of justice that brings the judicial office into disrepute, and improper action within the meaning of article VI, section 18 of the California Constitution.
“Having been appointed by the Chief Justice of the California Supreme Court to hear and take evidence in this matter, and having presided over a trial of the charges, the special masters submit this final report, containing findings of fact and conclusions of law, in accordance with rule 129(c) of the rules of the Commission on Judicial Performance.
*CJP Supp. 5 “FINDINGS OF FACT

“Burden of Proof

“The clear and convincing evidence standard of proof applies to this inquiry. (Geiler v. Commission on Judicial Qualifications (1973) 10 Cal.3d 270, 275 [110 Cal.Rptr. 201, 515 P.2d 1].) ‘Evidence of a charge is clear and convincing so long as there is a “high probability” that the charge is true. [Citations.] The evidence need not establish the fact beyond a reasonable doubt.’ (Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1090 [77 Cal.Rptr.2d 408, 959 P.2d 715].)
“Count One: People v. Mello
“In December 1999, Judge O’Flaherty presided over a jury trial in the case of People v. Mello (Placer County Super. Ct. case No. 62-7093). (Judge Joseph W. O’Flaherty’s Answer to Notice of Formal Proceedings (hereafter Answer), p. 1.) Ms. Mello, an African-American, was charged with second degree robbery and false imprisonment. Pursuant to Code of Civil Procedure section 232, subdivision (a), the prospective jurors were sworn to tell the truth during voir dire concerning their qualifications and competency.
“As a resident of Placer County for 23 years, Judge O’Flaherty has become familiar with the demographics of the county. According to the judge, the jury venire panels in 1999 were almost entirely Caucasian. His recollection is that during voir dire in the Mello case, the jury panel was overwhelmingly Caucasian, and Ms. Mello was the only African-American in the courtroom. Concerned that racial bias could impact the verdict, Judge O’Flaherty instructed the panel:
“ ‘Now, a touchy subject. Some of these voir dire issues are kind of touchy here. If you feel that an issue is so sensitive that you’d rather not answer it in front of all these people, we can arrange so that it would be the Court, myself, the two attorneys, the defendant and the court reporter, but some of these questions do need to be asked.
“ ‘All right. Here’s a sensitive one. The defendant is African American. Okay. Almost everybody in this courtroom is white, Caucasian.
“ ‘Now, race simply does not—I don’t want any racism in my court, which most of you know by now, but I go a little further than that.
“ T recognize that most people in today’s age don’t want to raise their hand and say I am a bigot or I’m a racist. So what I’m going to do, if any of *CJP Supp. 6 you have the slightest doubt that you might not, for racial reasons, be able to give this defendant a fair trial, I’m going to give you permission to lie.
“ T want you to tell me—there’s plenty of other reasons, which you as intelligent people know that you can dream up, how you will not—you can get out of sitting here.
“ ‘Okay. I want you to come up with something so that you can get out of sitting here. I don’t want that issue to raise its head in this courtroom. All right. Can everybody assure me of that?’
“Judge O’Flaherty decided to give this instruction either on the morning of the trial or on the previous day. This was the first time he had given such an instruction. Although Judge O’Flaherty has previously presided over at least 10 jury trials involving minority defendants, he had no direct evidence that jurors had lied during voir dire to cover up their racial prejudice. He was, however, still concerned that some jurors might not acknowledge racial animus, and he wanted to give them a way to get off the jury. According to Judge O’Flaherty, rather than forcing jurors to ‘choose between openly admitting racism or keeping quiet and erroneously being selected,’ he told them to lie as a way of ensuring that race would not become an issue in the trial. Judge O’Flaherty testified that when he gave this instruction, he was looking for any kind of false excuse that would get the person with racial animus off the jury. Typical excuses jurors might give would be that they had a business to attend to or that the type of crime would engender prejudice on their part.
“Judge O’Flaherty gave a number of reasons for instructing the jurors to lie. One rationale for the instruction related to a prior case involving a minority defendant, in which a prospective juror admitted during voir dire that he did not think he could be fair ‘ “because the defendant is Mexican.” ’ According to Judge O’Flaherty, as the juror was leaving the courtroom, Judge O’Flaherty perceived that the remaining panel exhibited hostility toward the excused juror because of his racial bias. Judge O’Flaherty testified that another reason for the instruction was to emphasize to those jurors who did sit on the jury the importance of not considering race in their verdict. Finally, the judge explained that he had had conversations with criminal defense attorneys who complained that jurors in Placer County were not giving minority defendants a ‘fair shake . . . ,’[1]
*CJP Supp. 7 “Judge O’Flaherty thought that the Mello trial was a ‘ “perfect storm” ’ for the problem of a jury finding the defendant guilty due to [her] race. According to the judge, there were three elements which made the case a [1] “perfect storm” ’: (1) the defendant was of a different race than the jury; (2) the facts of the case were inflammatory; and (3) there was a perception in Placer County that criminals were invading the county to commit crimes.
“During a recess following the judge’s instruction, defense counsel moved for a mistrial on the ground that the judge had tainted the jury panel by referring to Ms. Mello’s race as African-American and then within a couple of minutes thereafter making reference to the O.J. Simpson trial. Defense counsel believed that connecting the two events prejudiced Ms. Mello’s right to a fair trial. Although defense counsel did not object to the instruction standing alone, he cited to it during the course of argument in support of the mistrial. Judge O’Flaherty denied the motion for mistrial and also denied a motion to discharge the entire panel and replace it with a new one.
“Additional jurors were subsequently called during the afternoon session. Judge O’Flaherty informed them that if a sensitive question was asked, then any juror could request to answer the question privately in chambers with the judge, counsel, defendant, and court reporter present. Judge O’Flaherty then instructed the new jurors:
“ ‘Now, the defendant is African American. Okay. Obviously, racism has no place in the courtroom. I would like to see it have no place at all, but it’s around, and so I don’t want it in here.
“ ‘So when we go through this, I mean, I know that some people, unfortunately, still harbor some bigotry, and my job is definitely not to judge you jurors. I want to make that clear, and I’m not doing that; but on the other hand, like I said, bigotry cannot have any place in this courtroom.
“ ‘If you feel, if you have the slightest doubt that you can give the defendant a fair trial because of this reason, you can just come right out and say it.
“ ‘That would be one way to do it, but I recognize that this is—it’s kind of insulting and embarrassing to raise your hand and say I’m a racist.
*CJP Supp. 8 “ ‘What I’d like you to do, and I will give you permission in this very narrow area, you can lie. You can say that—what I want you to do is to find some other reason to get excused.
“ ‘It doesn’t take a rocket scientist to figure out how to get excused, if you put your mind to it, and I’d rather have you do that than sit on the jury if there’s a problem in this area. Okay. Does everybody understand that?
“ ‘Is there anybody who feels, who is willing to say that they cannot or might not give the defendant a fair trial because of race? Anybody?’
“Judge O’Flaherty contended that he did not tell the jurors to lie directly about race or their racial feelings or animus. He denied that he gave jurors permission to he about racial prejudice. The judge explained that he told the jurors that if they had a problem admitting racial animus, ‘they could come in and have a chambers conference with me, and/or they could admit it directly.’ Judge O’Flaherty testified that he told the jurors that ‘if, and only if, . . . they could not admit this [racial animus] and would otherwise stay on the jury, . . . they should find some other excuse to get off the jury.’
“Despite Judge O’Flaherty’s rationale for the instructions, he did, in fact, give the jurors permission to lie about racial prejudice, and his instructions conflicted with the jurors’ oath to tell the truth pursuant to Code of Civil Procedure section 232, subdivision (a). The judge told the first group of jurors that ‘if any of you have the slightest doubt that you might not, for racial reasons, be able to give this defendant a fair trial, I’m going to give you permission to lie.’ The judge again repeated this instruction when he told the second group of jurors, T will give you permission in this very narrow area, you can lie.’
“Although the judge prefaced his remarks by announcing that if a juror would rather not answer a sensitive question in the courtroom, the juror could answer the question in chambers, this statement was not necessarily directed to the issue of racial bias and was superseded by the more specific instruction to lie about racial prejudice. Moreover, when Judge O’Flaherty told the jurors that sensitive matters could be discussed in chambers, he also stated, ‘It will cause some pomp and circumstance, but I’ll accommodate you if you feel that way.’ This ‘pomp and circumstance’ remark had the effect of discouraging potential jurors from seeking an in-chambers meeting with the judge and no potential juror requested such a meeting.
“While Judge O’Flaherty claimed that he did not preclude voir dire by the lawyers on the subject[] of racial animus, and that he wanted the lawyers to ask questions about race, he nonetheless discouraged potential jurors from *CJP Supp. 9 being introspective and taking an appropriate amount of time to assess their ability to be fair when he told the panel:
“ ‘Okay. I’ll tell you folks the same thing I told the jurors up there. If you hesitate in your answer, these attorneys are going to go after you on it. Believe me. One hundred percent, they will go after you.
“ ‘Okay. So just a clue as to how to answer these questions.’
“This remark prohibited a full and honest response by the jurors by limiting the disclosure of vital information relevant to challenges for cause.
“Prior to instructing jurors that they could lie regarding racial animus, Judge O’Flaherty was unaware of any cases, statutes, or other authority that allowed a potential juror to make up an excuse in order to be dismissed from the jury. He had not consulted other judges regarding the propriety of giving such an instruction and had not heard of any other judge giving a similar instruction. It had never been suggested at a judicial education class attended by Judge O’Flaherty that judges should have jurors lie during voir dire. The established practice in Placer County, as throughout California, was to have jurors answer all questions truthfully during voir dire.
“At the conclusion of voir dire, no juror was excused because of racial bias. Judge O’Flaherty did not know whether any juror followed his instruction and made up an excuse to get off the jury.
“A jury was ultimately impaneled and Ms. Mello was convicted. Ms. Mello moved for a new trial on among other grounds that the instruction authorizing jurors to cover up any feelings of racial bias by lying was given in conjunction with a discussion of the O.J. Simpson case. Judge O’Flaherty denied the motion and Ms. Mello appealed.
“In April 2002, the Court of Appeal, by unanimous vote, reversed the conviction on the grounds that Judge O’Flaherty’s instructions to prospective jurors to he under oath during voir dire violated the defendant’s rights under the United States and California Constitutions to a fair and impartial jury and to due process of law. (People v. Mello (2002) 97 Cal.App.4th 511 [118 Cal.Rptr.2d 523].)
“Count Two: People v. Abbaszadeh
“In February 2000, Judge O’Flaherty presided over a jury trial in the case of People v. Abbaszadeh (Placer County Super. Ct. case No. 63-1593). Mr. Abbaszadeh, an Iranian immigrant, was charged with grand theft by false *CJP Supp. 10 pretenses and sale of securities by means of false statements or omissions. After the prospective jurors were sworn to tell the truth during voir dire pursuant to Code of Civil Procedure section 232, subdivision (a), Judge O’Flaherty told the jury panel:
“ ‘Now, you probably all know that race and nationality have no place in this courtroom. The very integrity of the system that has developed in the last several generations depends on that we keep this social problem at least out of the courtroom.
“ ‘Now, obviously being labeled a bigot or a racist, this sort of thing, is insulting to most people. And so it’s entirely possible that if you harbor these types of feelings that you may not want to raise your hand and basically put a sign on yourself saying: I am a racist, etcetera.
“ T don’t want somebody who harbors those types of feelings sitting on this jury, for obvious reasons.
“ ‘So I would ask that you do whatever you have to do to get off the jury. And it’s much more important, in my opinion, that you get off the jury, even if, you know, you have to answer my questions in such a way that you get off in some other way, then do it.
“ ‘Does everybody understand that?’
“ ‘Is there anybody in the 18 who has a slightest doubt that they can give the defendant in this case a fair trial or in any way consider his nationality or race or this sort of thing?
“ ‘Is there anybody who feels that way?’
“Judge O’Flaherty decided to give the instruction right before jury selection or during voir dire. After the instruction was given, one potential juror admitted that he had feelings of prejudice toward Mr. Abbaszadeh. This juror was excused. Unlike Mello, defense counsel did not object to the instruction.
“Judge O’Flaherty admitted that he was telling potential jurors that they could invent an excuse to get off the jury if necessary. The judge testified that the instruction ‘was calling for them to lie as far as invent a false excuse if they were racist and there was no other way to handle it, yes. It was not telling them to lie about race.’
“As in Mello, Judge O’Flaherty decided to give the instruction to provide a biased juror with a way of getting off the jury without publicly admitting to *CJP Supp. 11 racism or bias. At the time the judge gave the instruction, he did not believe the instruction was erroneous and he did not intend to violate the rights of criminal defendants.
“While the instruction in Abbaszadeh did not give potential jurors direct permission to lie as in Mello, nevertheless it invited potential jurors to hide their racial bias. Judge O’Flaherty told the jurors, ‘[Y]ou may not want to raise your hand and basically put a sign on yourself saying: I am a racist, etcetera.’ He then told them to ‘do whatever you have to do to get off the jury . . . even if . . . you have to answer my questions in such a way that you get off in some other way’ than admitting racial bias. By instructing the venire in such a manner, the judge was impliedly giving potential jurors permission to lie in response to his question that immediately followed the instruction: ‘Is there anybody in the 18 who has a slightest doubt that they can give the defendant in this case a fair trial or in any way consider his nationality or race or this sort of thing?’ As in Mello, Judge O’Flaherty could not tell whether any juror followed his instruction and made up an excuse to get off the jury.
“Although Judge O’Flaherty claimed that he did not preclude voir dire by lawyers on race or ethnicity, like Mello, he again discouraged jurors from showing any hesitancy regarding whether they could be fair when he stated to a potential juror:
“ ‘[L]et me give you a clue how to answer the questions around here.
“ ‘If you hesitate, you know, the attorneys, trust me, will jump on that like a duck on a June bug. Keep that in mind.’
“A jury was ultimately impaneled and Mr. Abbaszadeh was convicted. He subsequently appealed the conviction. In February 2003, the Court of Appeal, by a vote of 2-1, reversed the conviction and remanded the matter to the Placer County Superior Court with directions to reassign the case to a different judge. (People v. Abbaszadeh (2003) 106 Cal.App.4th 642, 651 [130 Cal.Rptr.2d 873].)

“Evidence of Mitigation

“Judge O’Flaherty acknowledged at the hearing that it was a ‘mistake to do it’ (give the instructions) and ‘I feel real badly about it.’
“Judge O’Flaherty submitted the declarations of five Abbaszadeh jurors and two Mello jurors. In general, the jurors found Judge O’Flaherty to be a fair judge who conducted the trial in an appropriate manner. Several jurors *CJP Supp. 12 commented that Judge O’Flaherty was sensitive to racial issues and emphasized that individuals with racial animus should not serve on the jury.
“Dean Starks, a Placer County criminal defense attorney, testified on behalf of Judge O’Flaherty. He testified that he has tried approximately 100 cases to verdict in Placer County. He has appeared before Judge O’Flaherty over 100 times and has tried four cases before him. Mr. Starks opined that the racial composition of a typical panel in Placer County is at least 95 percent Caucasian. As a trial attorney, Mr. Starks has serious concerns about racial bias in cases involving African-American defendants. Mr. Starks testified that Judge O’Flaherty is a fair and hard-working judge who is impartial and makes efforts to keep the courtroom free of bias.
“CONCLUSIONS OF LAW
“Having considered all the evidence, the Special Masters find there is clear and convincing proof that Judge O’Flaherty’s actions in instructing potential jurors to 1) lie during voir dire in Mello, and 2) violate their oath in Abbaszadeh, constitute conduct prejudicial to the administration of justice that brings the judicial office into disrepute, as alleged in counts one and two.
“We further find that the Commission has failed to prove by clear and convincing evidence that Judge O’Flaherty committed willful misconduct. The Commission has asserted that Judge O’Flaherty acted with knowledge that his actions were beyond lawful judicial power and/or that he acted with a conscious disregard for the limits of his judicial authority. We do not agree. We accept Judge O’Flaherty’s explanation that he believed in good faith that he was acting within his lawful judicial authority, without a conscious disregard for the limits of his judicial power.

“Prejudicial Misconduct

“Prejudicial misconduct includes acts that a judge ‘undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office.’ (Geiler v. Commission on Judicial Qualifications, supra, 10 Cal.3d 270, 284.) It is not necessary that actual observers view the judge’s conduct as prejudicial to the administration of justice; rather the appropriate standard is how an ‘ “objective observer” ’ would view the judge’s conduct. (Doan v. Commission on Judicial Performance (1995) 11 Cal.4th 294, 324-325 [45 Cal.Rptr.2d 254, 902 P.2d 272].)
“Code of Civil Procedure section 232, subdivision (a) requires that before voir dire begins, prospective jurors must agree to ‘ “. . . accurately and *CJP Supp. 13 truthfully answer, under penalty of perjury ....’” all questions concerning qualifications and competency to serve as trial jurors.
“Canon 2A of the Code of Judicial Ethics provides, ‘A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.’ (Italics added.)
“In People v. Mello, Judge O’Flaherty instructed the prospective jurors during voir dire:
“ T recognize that most people in today’s age don’t want to raise their hand and say I am a bigot or I’m a racist. So what I’m going to do, if any of you have the slightest doubt that you might not, for racial reasons, be able to give this defendant a fair trial, Pm going to give you permission to lie.’
“In People v. Abbaszadeh, Judge O’Flaherty stated to the prospective jurors during voir dire:
“ ‘Now, obviously being labeled a bigot or a racist, this sort of thing, is insulting to most people. And so it’s entirely possible that if you harbor these types of feelings that you may not want to raise your hand and basically put a sign on yourself saying: I am a racist, etcetera.
“ T don’t want somebody who harbors those types of feelings sitting on this jury, for obvious reasons.
“ ‘So I would ask that you do whatever you have to do to get off the jury. And it’s much more important, in my opinion, that you get off the jury, even if, you know, you have to answer my questions in such a way that you get off in some other way, then do it.’
“By instructing the jurors to lie under oath in Mello and to ‘do whatever you have to do to get off the jury’ in Abbaszadeh, Judge O’Flaherty directed the jurors to violate their oath in contravention of Code of Civil Procedure section 232, subdivision (a). As a result, Judge O’Flaherty not only condoned violating the law, but he directed it.
“Judge[] O’Flaherty’s conduct would appear to an objective observer to be prejudicial to public esteem for the judicial office. It is uncontroverted that the jurors were sworn to tell the truth in the presence of Judge O’Flaherty. He thereafter directed and encouraged them to ignore and violate that oath. Such action on its face cannot be reconciled by any objective observer to be anything but prejudicial to public esteem for the judicial office. The public *CJP Supp. 14 expects and embraces the concept that a judge shall be faithful to the law. This is so fundamental to a system of justice that it serves as a basic cornerstone of public confidence.
“In addition, such conduct casts doubt upon whether the jury selected in each case was truly fair and impartial. Rather than providing a probing examination by the court and counsel to determine if racial bias existed, Judge O’Flaherty’s actions allowed jurors to create excuses to avoid jury service thereby depriving the defendants of a jury drawn from a fair and representative cross-section of the community.
“Judge O’Flaherty’s failure to follow the law in this context is a violation of the fundamental constitutional right to a trial by jury. Ignorance of the law or other action that effectively deprives an individual of their constitutional rights amounts to judicial misconduct even when there is no evidence of bad faith. (Ryan v. Commission on Judicial Performance (1988) 45 Cal.3d 518, 530-531, 540-541 [247 Cal.Rptr. 378, 754 P.2d 724].)
“As noted in the Advisory Committee Commentary to Canon 2A: ‘Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges.’
“Based upon the findings of fact and the reasoning expressed in the conclusions of law, we find that Judge O’Flaherty’s actions constituted conduct prejudicial to the administration of justice.” (Original italics, fn. added.)
II
JUDGE O’FLAHERTY’S LEGAL CONTENTIONS
In briefs filed with the commission pursuant to Commission rule 130, as well as at oral argument before the commission pursuant to rule 132, Judge O’Flaherty asserted that he committed only good faith legal error, and therefore the commission neither could nor should discipline him. We disagree on both accounts. In this part, we discuss the bases for our authority to discipline Judge O’Flaherty. In part III, we set forth our reasons for exercising that authority by issuing this public admonishment.
A. “Prejudicial Misconduct, ” by Definition, Includes Good Faith Conduct That Is Unjudicial.
Under article VI, section 18, subdivision (d) of the California Constitution, the commission may discipline a judge, among other grounds, *CJP Supp. 15 for “willful misconduct in office” as well as for “conduct prejudicial to the administration of justice that brings the judicial office into disrepute.” The California Supreme Court has provided definitional content for both constitutional standards.
Willful misconduct is (1) unjudicial conduct that is (2) committed in bad faith (3) by a judge acting in his or her judicial capacity. (Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at p. 1091; Dodds v. Commission on Judicial Performance (1995) 12 Cal.4th 163, 172 [48 Cal.Rptr.2d 106, 906 P.2d 1260].) Willful misconduct includes conduct prejudicial, or “prejudicial misconduct,” as a lesser included offense. (See Gonzalez v. Commission on Judicial Performance (1983) 33 Cal.3d 359, 369, fn. 5 [188 Cal.Rptr. 880, 657 P.2d 372].)
In order to determine whether a judge’s conduct is “unjudicial,” the conduct is measured with reference to the California Code of Judicial Ethics. (See Dodds v. Commission on Judicial Performance, supra, 12 Cal.4th at p. 172.) “ ‘The failure of a judge to comply with the canons “suggests performance below the minimum level necessary to maintain public confidence in the administration of justice.” ’ ” (Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 878 [42 Cal.Rptr.2d 606, 897 P.2d 544] (Adams II), quoting Adams v. Commission on Judicial Performance (1994) 8 Cal.4th 630, 662 [34 Cal.Rptr.2d 641, 882 P.2d 358] (Adams I).) As discussed in this opinion, Judge O’Flaherty’s conduct in giving the instructions violated both canon 2A and canon 1 and was unjudicial.
A primary distinction between the two types of judicial misconduct is the presence or absence of bad faith. “Unlike wilful misconduct, prejudicial conduct does not require the presence of bad faith, but may occur when a judge, though acting in good faith, engages in conduct that adversely would affect the esteem in which the judiciary is held by members of the public who become aware of the circumstances of the conduct.” (Adams II, supra, 10 Cal.4th at p. 878, citing Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826, 832 [264 Cal.Rptr. 100, 782 P.2d 239], and McCullough v. Commission on Judicial Performance (1989) 49 Cal.3d 186, 191 [260 Cal.Rptr. 557, 776 P.2d 259]; accord, Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at p. 1092.)
Here, the masters concluded, based on Judge O’Flaherty’s testimony, that he acted in good faith. Although we adopt that conclusion, the matter is not beyond discussion. The Court of Appeal described Judge O’Flaherty’s instructions in Mello as “grave error” (People v. Mello, supra, 97 Cal.App.4th at p. 513) and “astonishing” (id. at p. 516), and in Abbaszadeh as “shocking” (People v. Abbaszadeh, supra, 106 Cal.App.4th at p. 645) and “notorious]” *CJP Supp. 16 (id. at p. 650). Arguably, such unquestionably alarming behavior satisfies the Supreme Court’s bad faith standard as constituting bad faith: A “judge’s reckless or utter indifference to whether judicial acts being performed exceed the bounds of the judge’s prescribed power is a state of mind properly • characterized as bad faith.” (Broadman v. Commission on Judicial Performance, supra, 18 Cal.4th at p. 1092.) Here, Judge O’Flaherty’s laudable objective of rooting out bias seems to have blinded him both to his extralegal method of accomplishing the goal, and to the possible or even likely consequences of authorizing lying in his courtroom. However noble the goal, the ends cannot justify any and all means. At some point, a judge’s obliviousness to the consequences of the means to a given end may override, as a matter of law, a judge’s statement of subjective good intent. The masters accepted Judge O’Flaherty’s testimony that he was acting in good faith, and we are willing to allow that to be ultimately dispositive of the issue here, particularly since it is not determinative of whether sanctions are appropriate or of the level of actual discipline to be imposed. Further, the fact that Judge O’Flaherty believed in good faith that he was acting within his lawful judicial authority does not insulate him from a charge of prejudicial misconduct, which as noted, by definition may include unjudicial conduct undertaken by a judge in good faith.
It is not necessary that actual observers view the judge’s conduct as prejudicial to the administration of justice; rather the appropriate standard is how an “ ‘objective observer’ ” would view the judge’s conduct. (Doan v. Commission on Judicial Performance, supra, 11 Cal.4th at pp. 324-325.) “The subjective intent or motivation of the judge is not a significant factor in assessing whether prejudicial conduct has occurred under this [objective observer] standard.” (Adams II, supra, 10 Cal.4th at p. 878, citing Gonzalez v. Commission on Judicial Performance, supra, 33 Cal.3d at p. 376.)
Judge O’Flaherty admitted that he should not have used the term “lie” in the Mello instruction because of “the effect it might have on the people who, outside the courtroom, heard it.” Beyond that admission is the fact that after administering the oath to tell the truth to the jury panelists in both cases, he promptly directed and encouraged them to violate that very oath, thereby eviscerating it. As stated in the earlier quote from the masters’ report, and as adopted by us (ante, at pp. 13-14): “Such action on its face cannot be reconciled by any objective observer to be anything but prejudicial to public esteem for the judicial office. The public expects and embraces the concept that a judge shall be faithful to the law. This is so fundamental to a system of justice that it serves as a basic cornerstone of public confidence.”
It is incomprehensible to us that any objective person could observe, or later hear about, Judge O’Flaherty’s serious undermining of the jurors’ oath *CJP Supp. 17 without it negatively influencing such person’s opinion of the entire ensuing process in the courtroom, including his or her esteem for the judge presiding.
B. The Oberholzer Decision Supports the Commission’s Imposition of Discipline on Judge O’Flaherty.
Judge O’Flaherty conflates his argument that he cannot be disciplined for “good faith legal error” with the contention that under a “special rule” enunciated by the Supreme Court decision in Oberholzer v. Commission on Judicial Performance (1999) 20 Cal.4th 371 [84 Cal.Rptr.2d 466, 975 P.2d 663], the commission is precluded from disciplining him. While unquestionably there is a “special rule” under Oberholzer applicable to cases involving “legal error,” this is not such a case.
The “special rule” of Oberholzer to which the judge alludes is stated by the court as follows: “Mere legal error, without more, ... is insufficient to support a finding that a judge has violated the Code of Judicial Ethics and thus should be disciplined.” (Oberholzer v. Commission on Judicial Performance, supra, 20 Cal.4th at p. 398.) The court specified certain instances of conduct or circumstances that “in addition” to the “legal error,” would support investigation and discipline by the commission, namely, “bad faith,” “bias,” “abuse of authority,” “disregard for fundamental rights,” “intentional disregard of the law,” “or any purpose other than the faithful discharge of judicial duty.” {Ibid., italics omitted.) Here, since there is considerably more than “mere legal error,” this case is distinguishable from Oberholzer.
The Oberholzer case arose out of Judge Oberholzer’s issuance of an order dismissing a single criminal case because the prosecution was not ready to proceed and had failed to file a written motion to continue the trial. That single judicial ruling, or decision, was the only judicial conduct in question. The Supreme Court was considering that one ruling in the context of the provision of canon 1 that states “[a] judicial decision or administrative act later determined to be incorrect legally is not itself a violation of [the California Code of Judicial Ethics].” (Oberholzer v. Commission on Judicial Performance, supra, 20 Cal.4th at p. 395, some italics omitted.) Judge Oberholzer contended that a single ruling—“a judicial decision” in the language of canon 1—could never constitute misconduct if it had any intellectual merit. (20 Cal.4th at p. 396.) The commission contended—again focused on a single ruling—“that an act that is legally erroneous” {ibid., italics added) can involve misconduct if there are extraneous circumstances that implicate the canons, and that the proper analytic focus was on the “additional circumstances that surround the ruling in question” {id. at p. 397, original italics).
*CJP Supp. 18 The Supreme Court agreed with the commission on this point, noting that conduct beyond a single ruling may implicate other canons and constitute misconduct. The court stated, “A judge may, through repeated legal error, commit acts that would lead to violations of the judicial canons” (Oberholzer v. Commission on Judicial Performance, supra, 20 Cal.4th at p. 397), giving as an example, “A judge who repeatedly dismisses certain kinds of claims might be subject to discipline . . .” (id. at p. 398). Even in that example, however, it seems clear the court was looking at a series of individual rulings or decisions (repeated dismissal orders), each of which was legally erroneous, but that cumulatively might suggest some broader-based misconduct. In our view, the initial trigger for the applicability of Oberholzer is that there be “a judicial decision or administrative act”—something that implicates the language of canon 1, as was the situation in that case.
In contrast to Judge Oberholzer’s single order of dismissal, Judge O’Flaherty did not make any discrete ruling or decision that was legally incorrect. Rather, he gave a series of improper directives to the various jury panel members in two separate cases; he engaged in a repeated course of improper conduct. That broad-based wrongful conduct directly violates particularly canon 2A, for the reasons explained by the masters (ante, at pp. 12-13), and subjects Judge O’Flaherty to our jurisdiction. The course of conduct was unjudicial, and not “mere legal error.”
In addition, the appellate court held that Judge O’Flaherty’s instructions in Mello violated the defendant’s federal and state constitutional rights to a fair and impartial jury and to due process of law (People v. Mello, supra, 97 Cal.App.4th at p. 515), and in Abbaszadeh, described the Mello error as “structural error” that “rendered the trial fundamentally unfair, requiring reversal without a showing of prejudice.” (People v. Abbaszadeh, supra, 106 Cal.App.4th at p. 644.) In Abbaszadeh, the court again found “Mello error” (ibid.), and again reversed the conviction because the error was “structural” (id. at p. 647), that “ ‘irremediably tainted the trial by making it impossible for the parties to know whether a fair and impartial jury had been seated’ ” (ibid., quoting People v. Mello, supra, 97 Cal.App.4th at p. 517). As stated by the Court of Appeal: “[T]he instructions to lie about racial bias resulted in voir dire so inadequate as to render the trial fundamentally unfair. [Citation.] This error—which inevitably skewed the integrity of the entire voir dire process and adversely affected the manner in which, the jurors would evaluate the evidence—is a ‘defect affecting the framework within which the trial proceeds’ .... [Citations.]” (People v. Mello, supra, 97 Cal.App.3d at p. 519.)
Judge O’Flaherty’s actions constitute misconduct because, as soundly denounced by the Court of Appeal, they manifest,- at least, an intentional *CJP Supp. 19 disregard of the law, a disregard of fundamental rights and an abuse of judicial authority, any and all of which warrant discipline, including under the “legal error plus” standard of Oberholzer.
Intentional Disregard of the Law: Although we believe that Oberholzer is factually inapposite to this case, it nonetheless provides useful guidance for determining whether there is misconduct that may or should subject Judge O’Flaherty to discipline by the commission. In that regard, the case the Supreme Court cited in Oberholzer v. Commission on Judicial Performance, supra, 20 Cal.4th at page 398 as illustrative of “intentional disregard of the law” is Cannon v. Commission on Judicial Qualifications (1975) 14 Cal.3d 678, 695-698 [122 Cal.Rptr. 778, 537 P.2d 898]. Two types of conduct underlay the disregard of the law by Judge Cannon—violations of the law concerning contempt (id. at pp. 695-696) and violations of a Supreme Court decision concerning the power of a judge to involuntarily remove defense counsel in a criminal case (id. at pp. 696-698).
In light of the unique rules concerning misconduct in connection with abuse of the contempt power (see, e.g., Rothman, Cal. Jud. Conduct Handbook (2d ed. 1999) Contempt, § 4.03, pp. 101-102), there is some question of the broader applicability of the court’s reasoning concerning Judge Cannon’s contempt violations to Judge O’Flaherty’s conduct. However, the court’s analysis in Cannon of the second issue (Judge Cannon’s failure to follow the court’s earlier decision on removing counsel) seems very instructive here.
In a number of instances, Judge Cannon had relieved appointed counsel in ongoing criminal prosecutions and substituted newly appointed counsel, a practice the commission had concluded amounted to an unlawful interference with the attorney-client relationship and constituted misconduct. (Cannon v. Commission on Judicial Performance, supra, 14 Cal.3d at pp. 695-696.) Judge Cannon argued before the Supreme Court that under the circumstances of the various underlying criminal cases, she had the inherent power to remove the attorney. But the court cited its earlier opinion in Smith v. Superior Court (1968) 68 Cal.2d 547 [68 Cal.Rptr. 1, 440 P.2d 65], where it had detailed a judge’s duty to balance the competing interests of adequate representation of the defendant against the sanctity of the attorney-client relationship in connection with a proper judicial removal of counsel. The court held that by reason of Judge Cannon’s failure to follow the clearly enunciated law of Smith, her conduct was improper and warranted discipline. (Cannon v. Commission on Judicial Performance, supra, 14 Cal.3d at pp. 696-698.)
The Supreme Court pointed out that Judge Cannon’s misconduct arose “not only in the fact of the substitutions but also the manner in which they were *CJP Supp. 20 accomplished.” (Cannon v. Commission on Judicial Performance, supra, 14 Cal.3d at p. 697, original italics.) As concerns the judge’s “manner,” the court summarized the serious infringement of rights that ensued as a result of the judge’s improper substitutions. {Id. at pp. 697-698.) In other words, the misconduct was not attributable solely to the fact that she removed counsel, but that the way she did it resulted in infringements of fundamental rights.
The important part of Cannon for present purposes is that there is no indication that Judge Cannon was aware of the Smith decision or that what she was doing ran afoul of the case or impacted on protected attorney-client relations or right to counsel. Nonetheless, her failure to heed Smith, viewed from the vantage point of the ensuing infringements of important protected rights, was denounced by the court in Oberholzer as an intentional disregard of the law.
Here, as noted by the Court of Appeal in Mello, there was clear law from the Supreme Court concerning the proper way for Judge O’Flaherty to accomplish his goal of getting bias out of his courtroom: “There is a simple way during voir dire for trial judges to inquire properly into racial bias. They need only follow the Judicial Council’s guidelines for such inquiry, which our high court has expressly endorsed. [Citing People v. Holt (1997) 15 Cal.4th 619, 660, fn. 13 & 661 [63 Cal.Rptr.2d 782, 937 P.2d 213].] [Citation.] . . . [][] Our Supreme Court has pointedly observed: ‘Trial court judges should closely follow the language and formulae for voir dire recommended by the Judicial Council in the Standards to ensure that all appropriate areas of inquiry are covered in an appropriate manner.’ (People v. Holt, supra, 15 Cal.4th at p. 661.)” (People v. Mello, supra, 97 Cal.App.4th at p. 516, italics added.)
Judge O’Flaherty was not aware he was violating Holt when he implemented his own procedures to attempt to rid the juries of bias. Likewise, he appeared oblivious to the serious constitutional ramifications of his variance from the high court’s directive. But it seems that he, like Judge Cannon, by reason of “the manner” in which he conducted himself, nonetheless “intentionally disregarded” the clear law enunciated in an earlier Supreme Court case.
Judge O’Flaherty repeatedly told the jury panelists to violate their oath, alarmingly unaware of the broader impact those instructions almost necessarily would have on the defendants’ constitutional rights. This situation is a striking parallel to Judge Cannon’s repeated substitution of counsel in the middle of criminal trials, seemingly oblivious to the resulting impact on attorney-client relations or the quality of the legal defense. Although neither judge apparently was aware of a specific Supreme Court case that proscribed *CJP Supp. 21 their conduct, the determinative factor is that the overall manner in which they conducted themselves demonstrated a generalized, and serious lack of awareness or concern that the consequences of their conduct ran afoul of the law. Such serious inattention constitutes an intentional disregard of the law.
Disregard of Fundamental Rights: The Court of Appeal reversed the defendant’s conviction in the underlying Mello case, and then, based on “Mello error,” ordered a reversal in Abhaszadeh as well. The appellate court held that Judge O’Flaherty’s instructions resulted in a deprivation of “federal and state constitutional rights to a fair and impartial jury and to due process of law.” (People v. Mello, supra, 97 Cal.App.4th at p. 515.) The instructions undermined each defendant’s “ability to secure a fair and impartial jury and adversely affected the fundamental truth-finding function of the jury” (id. at p. 513) and “irremediably tainted the trial by making it impossible for the parties to know whether a fair and impartial jury had been seated” (id. at p. 517). The instructions “frustrated the main object of voir dire, to ‘ferretQ out bias and prejudice on the part of prospective jurors.’ ” (Id. at p. 518, quoting People v. Taylor (1992) 5 Cal.App.4th 1299, 1314 [7 Cal.Rptr.2d 676].) The instruction might have induced false statements that affected the composition of the juries and the outcome of the trials. (People v. Mello, supra, 97 Cal.App.4th at pp. 518-519.)
These themes are echoed by the masters as well, as follows: “[Judge O’Flaherty’s instructions cast] doubt upon whether the jury selected in each case was truly fair and impartial. Rather than providing a probing examination by the court and counsel to determine if racial bias existed, Judge O’Flaherty’s actions allowed jurors to create excuses to avoid jury service thereby depriving the defendants of a jury drawn from a fair and representative cross-section of the community.”
Judge O’Flaherty urges that his improper instructions “involving a constitutional right” should not subject him to discipline. There is more than an involvement of rights here though. There was an alarming disregard for consequences of the exercise of judicial power, including the impact on the most fundamental rights to an impartial jury and basic due process. Grave constitutional ramifications were inherent in the instructions such that even a modicum of forethought would have revealed the serious mistake that Judge O’Flaherty now concedes he made. We do not suggest in any way that the judge intended to cause a violation of the defendants’ constitutional rights, but rather, that he acted with irresponsible disregard concerning them.
As noted, intentional “disregard of the law” can result from serious inattentiveness to legal consequences of judicial acts or omissions. It seems clear that such heedless conduct by Judge O’Flaherty also satisfies the standard for nonintentional “disregard of fundamental rights.”
*CJP Supp. 22 Abuse of Authority: Code of Civil Procedure section 232, subdivision (a) requires prospective jurors to take an oath to respond truthfully during voir dire, and a violation of the oath may subject the person to prosecution for perjury. (E.g., People v. Blackwell (1987) 191 Cal.App.3d 925, 930-931 [236 Cal.Rptr. 803]; People v. Meza (1987) 188 Cal.App.3d 1631, 1633 [234 Cal.Rptr. 235].) There is no indication that the code section requiring the oath is unconstitutional, and as stated by the Court of Appeal in Mello, Judge O’Flaherty, therefore, did “not have authority to disregard” it; furthermore, the judge was not permitted to authorize, in advance, the violation of a valid criminal statute. (People v. Mello, supra, 97 Cal.App.4th at p. 517.) As found by the masters {ante, at pp. 8-9), the judge admitted that he was unaware of any arguable legal basis supporting his instructions. In fact, the Holt case proscribed it. The judge was absolutely without authority to instruct the panel members in Mello to lie, and to invite them to do so in Abbaszadeh.
As the masters pointed out {ante, at pp. 8-9), Judge O’Flaherty further frustrated his own stated goal of ridding his courtroom of bias because he “discouraged potential jurors from being introspective and taking an appropriate amount of time to assess their ability to be fair” by telling the second group of panelists in Mello that if they hesitated in answering a question, the lawyers would go after them. He stated, “Believe me. One hundred percent, they will go after you.” He made a similar comment to the first group in Mello and to the panel members in Abbaszadeh. And although the judge invited jurors to come into chambers to talle privately about bias, he quite effectively discouraged anyone from actually doing so by stating that such a meeting “ ‘will cause some pomp and circumstance.’ ”
Judge O’Flaherty argues that for there to be “abuse of authority,” there must be an intentional, bad faith violation of known authority, citing Spruance v. Commission on Judicial Qualifications (1975) 13 Cal.3d 778 [119 Cal.Rptr. 841, 532 P.2d 1209], on the claimed basis that Judge Spruance knew his actions were in violation of the law. The Supreme Court opinion in Spruance, however, makes clear that in a number of instances where Judge Spruance was held to have abused his authority, he merely “knew or should have known” the correct law. (See Spruance, supra, 13 Cal.3d at pp. 786 & fn. 6, 787 & fn. 7, 789 & fn. 10, 790 & fn. 11, 791-792 & fn. 12, 794 & fn. 15.)
Spruance does not support Judge O’Flaherty’s argument. Moreover, as we have noted, even conduct labeled by the Supreme Court as “intentional disregard of the law” may be satisfied by irresponsible lack of regard for legal consequences of judicial conduct. Nonintentional “abuse of authority” may also be satisfied by the same heedlessness to consequences. The Supreme Court has never indicated a view in accord with that asserted by Judge O’Flaherty and we do not believe it is the applicable standard. Judge *CJP Supp. 23 O’Flaherty overfocused his attention on the singular end result, thereby blinding himself to the shockingly improper means to that end, as well as to the serious negative consequences of those utilizing those means. He thereby abused his judicial authority.
Ill
DISCIPLINE
Judge O’Flaherty asserts that the two reversals by the Court of Appeal, and the extensive news coverage of those decisions in the local press in Placer County, already have provided adequate notice to the public that he committed error. We agree that the appellate court decisions made clear the justices’ views that Judge O’Flaherty’s conduct was shocking and astounding, and that reversals of the two criminal convictions were required because of the violations of fundamental constitutional rights.
The Court of Appeal, however, also referred this matter to this commission as “the body best suited to determine whether Judge O’Flaherty’s actions constitute actionable judicial misconduct.” (People v. Abbaszadeh, supra, 106 Cal.App.4th at p. 650, italics added.) The appellate court vindicated the defendants’ rights by reversing the convictions. Our mandate, in contrast, is the “ ‘enforcement of rigorous standards of judicial conduct’ ” and “ ‘the maintenance of public confidence in the integrity ... of the judicial system.’ ” (Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 918 [81 Cal.Rptr.2d 58, 968 P.2d 958], quoting Adams II, supra, 10 Cal.4th at p. 912.) For the reasons stated, we conclude there was conduct that was inconsistent with canon 2A, requiring judges to “respect and comply with the law” and to “act at all times in a manner that promotes public confidence in the integrity” of the judiciary, as well as canon 1, imposing a similar obligation on a judge to uphold the integrity of the judiciary.
In our view, therefore, it is necessary for this commission publicly to express its views that the instructions to he, however well intended, are incompatible with fundamental principles of the administration of justice. They constitute unjudicial conduct that is prejudicial to public esteem for the judicial office, and improper conduct by a judge that reflects an intentional disregard of the law, a disregard for fundamental rights and an abuse of judicial authority. This is different from the appellate court’s rulings concerning the defendants’ constitutional rights in the underlying prosecutions.
Judge O’Flaherty asserts that his instructions should not subject him to discipline because he was condoning lying only in limited or narrowly defined circumstances. We could not disagree more. Lying of any kind is *CJP Supp. 24 never appropriate in a court of law, the very existence of which is for the ascertainment of the truth. White lies, limited lying, carefully defined permissible lying are at the edge of a slippery slope that we decline to even approach. We cannot conceive that any judicial complicity in any lying in any courtroom ever could be proper, no matter how laudable any other goal the lying may be thought to advance.
The commission has not previously been faced with misconduct that directly matches Judge O’Flaherty’s behavior on the bench. However, prior decisions of the commission establish that failure by a judge to ensure the constitutional rights of defendants in criminal proceedings is a basis for discipline. In 1996, the Supreme Court adopted the commission’s recommendation of public censure of Judge Claude Whitney for conduct that included refusing to appoint counsel for defendants at arraignment. (In re Whitney (1996) 14 Cal.4th 1 [56 Cal.Rptr.2d 705, 922 P.2d 868].) Judge Whitney also had failed to advise defendants during the mass advisement of rights at arraignment proceedings that the right to counsel extended to representation at the arraignment itself, and had failed to advise defendants individually of the right to counsel at arraignment. (Id. at pp. 2-3.)
The commission has publicly admonished other judges who disregarded the law, albeit arguably in good faith. In 2003, we publicly admonished Judge James L. Roeder for failing to “ensure the rights of criminal defendants by his practice at felony and misdemeanor arraignment proceedings of stating, for the record, that defendants had waived their rights to have a preliminary examination or misdemeanor trial within applicable time limits, without properly obtaining the defendants’ consent to a waiver of those rights, in the manner prescribed by law.” (Public Admonishment of Judge James L. Roeder (2003) p. 4.) Judge Roeder’s motivation appeared to have been a “desire to accommodate defense counsel” who “ ‘routinely need[ed] time’ to open files and investigate cases” and whose practice was “not to schedule a preliminary examination or misdemeanor jury trial until the case was ‘conferenced.’ ” (Ibid.)
In 1998, the commission publicly admonished Judge Christopher J. Sheldon for permitting guilty pleas to be entered and sentences to be imposed in his absence pursuant to stipulation of the parties. (Inquiry Concerning Sheldon (1998) No. 142, Decision and Order of Public Admonishment [48 Cal.4th CJP Supp. 46].) Judge Sheldon “maintained that he did not think that the procedures violated the law and that he was motivated by a desire to make the pretrial calendar run more efficiently.” (Id. at pp. 5-6 [48 Cal.4th CJP Supp. at p. 53].) A public admonishment was imposed, notwithstanding the commission’s determination there was no bad faith and even though the judge “promptly changed his procedure after being counseled” by his supervising judge. (Id. at p. 6 [48 Cal.4th CJP Supp. at p. 54].)
*CJP Supp. 25 We repeat the masters’ apt summation here: “The public expects and embraces the concept that a judge shall be faithful to the law. This is so fundamental to a system of justice that it serves as a basic cornerstone of public confidence.” (Ante, at pp. 13-14.) Where serious acts of misconduct that undermine public confidence take place in open court, public discipline is “appropriate to assure the public that such actions are not condoned.” (Inquiry Concerning Broadman (1999) No. 145, Decision and Order Imposing Public Admonishment, p. 13 [48 Cal.4th CJP Supp. 67, 83].) Irrespective of the intended objective or any attenuating circumstances, judicial complicity in lying in a courtroom cannot be tolerated.
Commission members Mr. Marshall B. Grossman, Judge Frederick P. Horn, Mr. Michael A. Kahn, Mrs. Crystal Lui, Mr. Jose C. Miramontes, Mrs. Penny Perez, Judge Rise Jones Pichón, and Ms. Barbara Schraeger voted to impose a public admonishment. Commission member Justice Vance W. Raye was recused and commission member Ms. Patricia Miller did not participate in this matter. There is currently one public member vacancy on the commission.
The judge’s petition for review by the Supreme Court was denied on February 2, 2005.

 The masters concluded this sentence with the following clause: “. . . to the extent that concerns about jury bias were causing minority defendants to plead guilty.” We do not find the evidence supports the inclusion of this clause. According to the evidence adduced, there was one actual instance where a defendant reportedly pled guilty because of an alleged fear of being unable to obtain a fair jury trial. Under questioning by the examiner, Judge O’Flaherty *CJP Supp. 7 stated that this occurred after the Mello trial, and thus did not influence the instruction in Mello. The judge later placed the plea case as also having been after the Abbaszadeh trial (discussed post, at pp. 9-11)—thus precluding its having influenced his instructions in either case. Accordingly, for purposes of stating our own findings, we exclude this one clause on the ground it is not supported by the evidence.